## On the Petition of the STATE OF MARYLAND in the Matter of MARGARET GLENN.

*Construction of the Act of 1880, ch. 6—Legislative power—
Extent of Jurisdiction in cases of Habeas Corpus—Consti-
tutionality of sec. 10 of the Act of 1878, ch. 415, conferring
Jurisdiction upon Justices of the peace in certain cases—
Construction of Article 21 of the Declaration of Rights—
Writ of Habeas Corpus—Liberal construction of Commit-
ments in support of Jurisdiction, &c.—Erroneous judgment
in a case of Habeas Corpus—Presumption of the lawfulness
of the Conviction recited in a warrant of commitment, on
Habeas Corpus—Limit of the writ of Certiorari in respect
of the Record of conviction to be produced at the hearing of
a case on Habeas Corpus—Summary appeal by way of
Habeas Corpus authorized by the Act of 1874, ch. 233.*

M. G. was arrested and taken before a justice of the peace, acting as
a police justice, in the City of Baltimore, charged with being
habitually a disorderly person, leading a dissolute and disorderly
course of life. Upon trial and examination, the party was con-
victed, and sentenced by the justice to the Maryland House of
Correction, located in Anne Arundel County, for the period of six
months, the commitment bearing date the 14th of May, 1880. On
the 29th of May, 1880, a writ of *habeas corpus* was issued by Judge
Y., one of the Associate Judges of the third judicial Circuit of the
State, composed of the counties of Baltimore and Harford, directed
to the superintendent of the House of Correction, requiring him to
produce the body of M. G. together with the cause of her detention
on the 10th of June thence ensuing. The superintendent made
due return to the writ, produced the body of the prisoner as he
was required, together with a copy of the commitment as cause
and justification of her detention. The conviction and commit-
ment of the prisoner were founded on section 10 of the Act of
1878, ch. 415. Judge Y., upon the return to the writ discharged
the prisoner upon the ground that the jurisdiction under which
the prisoner had been convicted was unconstitutionally conferred,
and therefore the conviction was simply a nullity. At the instance

State *vs.* Glenn.

of the State, a copy of the papers and proceedings in the case, together with a printed copy of the opinion of Judge Y. under his hand and seal, was transmitted to this Court. Section three of the Act of 1880, ch. 6, provides that whenever any Court or Judge, having jurisdiction in the premises, shall release or discharge a party on *habeas corpus*, charged with the violation of any statute of this State, upon the ground that such statute is unconstitutional and void, in whole or in part, because contrary to the Constitution of the State, or of the United States, it shall be the duty of the Court or Judge so ordering the discharge, to reduce his opinion to writing within five days after such discharge, and to transmit the original papers in the case, together with a copy of the order of discharge, and of his opinion, under his hand and seal, to the clerk of the Court of Appeals; and that it shall be the duty of the said Court "to consider the papers so transmitted to its clerk, including said order of release or discharge, and said opinion, at the earliest practicable period after the receipt thereof by the clerk, and to give its opinion in writing upon the case so presented; and the said opinion so given shall have and possess the same authority as if the same was filed in a case formally heard and determined in said Court on appeal." HELD:

1st. That it was competent for the Legislature to require the Judge as prescribed in the aforesaid Act, to certify his judicial acts to the Court of Appeals for review; and the direction of the statute to transmit the proceedings must be taken in lieu of the formal entry of an appeal.

2nd. That the case being legally before the Court, its judgment therein is to be taken to be final and conclusive as in other cases of appeal.

3rd. That under the Constitution of the State, the power of the Judges of the several Courts of the State, in cases of *habeas corpus* is co-extensive with the limits of the State, and the restriction upon this power sought to be imposed by the first section of the Act of 1880, ch. 6, is nugatory and without effect; and the Judge below had jurisdiction to grant the writ of *habeas corpus*, though directed to the superintendent of a prison beyond the limits of his circuit.

The provision of the Act of 1878, ch. 415, sec. 10, conferring jurisdiction upon justices of the peace to try, convict and commit to the House of Correction, vagrant and habitually disorderly persons, is constitutional.

State *vs.* Glenn.

The provision of the Declaration of Rights that a party accused has the right to be informed of the charge against him, and to have a copy of the indictment or charge, if required, to enable him to prepare for his defence, simply means that no prosecution can be conducted in secret; but that all prosecutions shall be open and public upon specific charges, set forth by way of indictment or in such other form as the nature of the prosecution may require; and that the party shall not be denied full opportunity to make his defence.

The declaration in the Declaration of Rights that the accused party is entitled to a speedy trial by an impartial jury, must be understood as referring to such crimes and accusations as have by the regular course of the law and the established modes of procedure as theretofore practiced, been the subjects of jury trial.

The writ of *habeas corpus*, cannot be made, unless it be by express statute, to perform the functions of a writ of error, in bringing under review a judgment or sentence of a competent tribunal, simply for errors or irregularities in the proceedings, or in the rendition of the judgment or sentence. But otherwise, if the sentence or judgment be a nullity, or the justice be without jurisdiction.

The construction applied to commitments in execution by magistrates or tribunals of special and limited jurisdiction, must be liberal in support of the lawfulness of the exercise of the jurisdiction, when considered on returns to the writ of *habeas corpus*.

Inasmuch as the warrant of commitment showed a good and valid conviction, and the Judge below had no power or jurisdiction over the conviction for any errors or irregularities in the proceedings upon which it was founded, and could not review the facts of the case as upon appeal, but was confined, as the case was presented to him, to the legal sufficiency or insufficiency of the return to the writ of *habeas corpus*, he was in error in declaring that the trial and conviction of the prisoner were unlawful.

In cases where the magistrate has jurisdiction, and a conviction within that jurisdiction is recited in the warrant of commitment, on *habeas corpus*, the conviction is presumed to be lawful and proper until the contrary is shown.

In order to remove a record of conviction before an inferior tribunal to be examined by a Judge or Court hearing a case on *habeas corpus*, it is necessary that such record be produced by *certiorari* to such

inferior tribunal, to be issued and executed within the jurisdiction of such Judge or Court.

The summary appeal by way of *habeas corpus* authorized by the Act of 1874, ch. 233, cannot be taken to a Judge or Court beyond the limits of the county or city in which the original conviction was had.

APPLICATION of the State of Maryland in the matter of Margaret Glenn.

The nature of the case is stated in the opinion of the Court. After the prisoner was discharged from the House of Correction by order of Judge YELLOTT a petition was filed in this Court by the Attorney-General, praying that the Court would proceed in accordance with the terms of the Act of 1880, ch. 6, to give its opinion in writing upon the case presented by the commitment of the prisoner, the order for her discharge from confinement, and the opinion of Judge YELLOTT upon the case; and that it would also, for the general enforcement of its proper authority and jurisdiction in the premises, pass an order requiring Judge YELLOTT to transmit, forthwith, the original papers in the case of the prisoner, together with a copy of his order of discharge and of his opinion, under his hand and seal, to this Court. No order was passed on the petition; but a copy of the papers and proceedings in the case, together with a printed copy of the opinion of Judge YELLOTT, under his hand and seal, were transmitted to this Court.

The cause was submitted on brief on the part of the State, to BARTOL, C. J., BOWIE, BRENT, GRASON, MILLER, ALVEY, ROBINSON and IRVING, J.

*Charles J. M. Gwinn, Attorney-General,* for the State.

1. The Act of 1880, ch. 6, added a constitutional and perfectly proper section to the 43rd Article of the Code of Public General Laws. The section thus added, did not confer *original* jurisdiction on the Court of Appeals, but

*appellate* jurisdiction. This is settled by *Ex parte Boll-man,* 4 *Cranch,* 100, 101; *Ex parte Gerger,* 8 *Wallace,* 98, and *Ex parte Siebold,* 100 *U. S.,* 374. It was competent for the General Assembly to provide, by this summary method, for the revision by the appellate Court of the decision of any inferior Court, or Judge, which declared any law, under which a person was held in custody for an alleged offence, to be unconstitutional and void. *Const.* 1867, *Art.* 4, *sec.* 14. A method which secures a prompt revision of an error upon so grave a point, by compelling the review of such opinion forthwith, tends to the manifest advantage of public justice.

2. The Act of 1880, ch. 6, did not suspend any privilege of the *habeas corpus* Act. The privilege of the writ of *habeas corpus,* which existed at common law, is exactly stated in 4 *Bacon's Abridg., title* " *Habeas Corpus,*" *A, p.* 563: " Whenever a person is restrained of his liberty by being confined in a common jail, or by a private person, whether it be for a criminal or civil cause, he may regularly, by *habeas corpus,* have his body and cause *removed to some superior jurisdiction,* which *hath authority to examine the legality of such commitment,* and on the return thereof, either bail, discharge, or remand the prisoner."

Such superior jurisdiction would seem, upon the highest common law authorities, to have been limited by the common law to the Court of Chancery and to the Court of King's Bench, and not to have been vested in any Justice of the King's Bench. 1 *Coke's Inst., ch.* 11, *p.* 23, *ch.* 29, *pp.* 54, 55; 4 *Coke's Inst., ch.* 8, *p.* 81; 4 *Bacon's Abridg.,* 566; 2 *Hale, P. C.,* 147.

This limitation, imposed by the common law upon the number of Courts which could issue the writ of *habeas corpus,* did not suspend any common law right recognized by the Great Charter, or by the statutes which re-affirmed the particular privilege recognized by that Charter. The rules of the common law only provided the *remedy,*

·omitted by the Statutes of 9 Hen. 3, ch 29, and 28 Ed. 3, ch. 3, and 42 Ed. 3, ch. 3, which might be applied if any just right of personal liberty was violated. They prescribed the Courts and proceedings by which such common law right should be protected. But they left the privilege of the writ unharmed and undiminished. They did only that which might have been done by an Act of Parliament, if such Act had been passed.

The principles embodied in the Great Charter, and in these statutes, were again embodied in the statute known as the Petition of Right, 3 Chas. 1, ch. 1, and in the Act of 16 Chas. 1, ch. 10, secs. 1 and 8, and in 31 Chas. 2, ch. 2.

The last Act, the great *habeas corpus* Act, limited the jurisdiction in matters of *habeas corpus* in term time to the Lord CHANCELLOR, Lord KEEPER, or to the Courts to which it refers, conferring such jurisdiction on the separate Judges or Barons of such respective Courts *only in vacation time.* The right was not granted, by that statute, to any of the minor Courts, held by custom or charter, such as the Courts of the Counties Palatine, nor to the Ecclesiastical Courts, nor to justices of the peace.

The writ of *habeas corpus* was a prerogative writ, ·which ran to all places within the realm, *Richard Bourn's Case, Cro. Jas.,* 543; 4 *Bacon's Abridg., Habeas Corpus, A, p.* 564; 4 *Steph. Comm.,* 22. It certainly was not supposed that it was suspended in 1862, when Parliament provided by 25 Vict., ch. 20, that no writ of *habeas corpus* should issue out of England by authority of any Judge, or Court therein, into any colony or foreign dominion of the Crown, where her Majesty had a lawfully established ·Court with authority to grant and issue such writ, and to ensure its due execution throughout such colony or dominion. 4 *Steph. Comm.,* 22.

The designation in England of the Courts by which the writ should be issued, and of the territory in which ·such writ should be operative, was no suspension of the

writ of *habèas corpus;* but was only, on the contrary, an express provision for and designation of the *"superior jurisdiction"* which should have authority under the writ of *habeas corpus,* to examine the legality of a commitment.

The clause in the Great Charter, with the citation of which this argument was opened, was re-enacted in Art. 21 of the Declaration of Rights of 1776, in the same Article in the Declaration of Rights of 1850, in Art. 23 of the Declaration of Rights of 1864, and in the same Article of the Declaration of Rights of 1867.

This clause was an absolute recognition of the perpetual right of the citizen· to the privilege of the writ of *habeas corpus,* because the qualifying words in the Article, " or by the law of the land," which are found also in the clause cited from the Great Charter, are to be interpreted only as meaning, " without due process of law." 1 *Coke's Inst., m. p.* 50.

The provisions in Art. 7 of the Declaration of Rights of 1776,—in the same section of the Declaration of Rights of 1850 ; in the 9th Art. of the Declaration of Rights of 1864, and in the same Article of the Declaration of Rights of 1867,—" That no power of suspending laws, or the execution of laws, *unless by, or derived from the Legislature,* ought to be exercised or allowed,"—did not qualify this right, because the right of the citizen to have the cause of his imprisonment examined by a Superior Court was, under another Article contained in each of these instruments, a constitutional right, and not a right existing by law ; and could not, therefore, be suspended by the Legislature. And sec. 55 of Art. 3, of the Constitution of 1867, in providing that the General Assembly should pass no law suspending the privilege of· the writ of *habeas corpus,* added no new security, because the General Assembly had not the constitutional power to withhold from the citizen the right to have the cause of his imprisonment.

State *vs.* Glenn.

examined by some Superior Court. The 55th sec. of Art. 3, of the Constitution of 1867 was only the re-assertion in another form of a constitutional right which had been secured by prior Constitutions, and by a prior provision in the Declaration of Rights of 1867.

Art. 1, sec. 9, of the Constitution of the United States, provided that the privilege of the writ of *Habeas Corpus* should not be suspended unless when in cases of rebellion or invasion the public safety might require it. The words in sec. 55 of Art. 3 of our State Constitution, prohibiting the suspension of the privilege of the writ, are identical with those used in the section cited from the Constitution of the United States, in so far as those words apply to times of peace. The writ referred to in both Constitutions and in the Act of 1880, ch. 6, is the writ of *habeas corpus ad subjiciendum*, and none other. *Ex parte Bollman*, 4 *Cranch, S. C. Rep.*, 95, MARSHALL, C. J.; 1 *Story on Const.*, secs. 1339–1341. Is it not plain, then, that the General Assembly of Maryland has the same power to legislate under sec. 55 of Art. 3 of our State Constitution as Congress has under sec. 9 of Art. 1 of the Federal Constitution?

The great common law writ of *habeas corpus ad subjiciendum* was incorporated by the Federal Constitution into the organic law. That writ, at common law, ran into all parts of the dominion of the Crown. By parity of reasoning it ran, when thus engrafted on our Federal system, into all territory under the government of the United States. Yet Congress, by the Judiciary Act of 24th September, 1789, ch. 20, while vesting the power to issue writs of *habeas corpus* in the Supreme Court and Circuit and District Courts of the United States, limited the justices and Judges of said Courts to the power of issuing such writs within their respective jurisdictions. *Revised Stat. U. S., p.* 142, *secs.* 751, 752. Was this Act, in so far as it imposed such limitation, a violation of the Constitution of

the United States? No one at this day will affirm it; and yet if it was not, how can the Act of 1880, ch. 6, be held to be unconstitutional? This legislation of Congress, so far from being deemed to be unconstitutional, was recognized in a *habeas corpus* case in a Federal Court to be the expression of a plain principle of law? For it was held that the very allotment of Federal Circuit and District Courts of the United States to different localities, of *itself* "necessarily confines the jurisdiction of these local tribunals within the limits of the respective districts within which they are directed to be holden." *Ex parte Graham*, 4 *Wash. C. C. R.*, 211–212. The law thus laid down has never been questioned.

It can scarcely be necessary, after this example, to state others, and yet they abound. The Constitutions of Maine, Art. 1, sec. 10, adopted in 1819; of Vermont, Art. 12, adopted in 1836; of Pennsylvania, Art. 1, sec. 14, adopted in 1873; of Wisconsin, Art. 1, sec. 8, adopted in 1848; of Alabama, Art. 1, sec. 17, adopted in 1819, and Art. 1, sec. 18, adopted in 1875; of Michigan, Art. 1, sec. 12, adopted in 1835, and Art. 4, sec. 44, adopted in 1850; of Georgia, Art. 1, sec. 3, adopted in 1865, and Art. 1, sec. 13, adopted in 1868; of New Jersey, Art. 1, sec. 11, adopted in 1844, and of New York, Art. 1, sec. 4, adopted in 1846, all provide, in language identical almost with that contained in sec. 55 of Art. 3 of our Constitution of 1867, that no law shall be passed suspending the privilege of the writ of *habeas corpus.*

Yet in Maine, by its Revised Statutes of 1871, title 9, ch. 99, sec. 6, p. 744, application for the writ must be made to the Supreme Judicial Court in the county where such restraint exists, if it be in session, and, if not, to a justice thereof. In Vermont, by its General Statutes of 1862, title 15, ch. 43, sec. 2, p. 347, the writ can only be issued by the Supreme Court, and by the Court of the county where the restraint exists. In Pennsylvania the

writ must be issued by a Judge of the Supreme Court, or the President of the Court of Common Pleas, for the county within which the imprisoned person is detained. 1 *Brightly's Purdon's Digest, title Habeas Corpus, p.* 754. In Wisconsin the application must be made, primarily, to a Judge having jurisdiction over the territorial limits within which the prisoner is confined. *Statutes* 1871, *ch.* 158, *sec.* 3, *pp.* 1792, 1793. Kindred limitations are imposed by the law of Alabama, Code 1852, sec. 3711, p. 651; by the Revised Statutes of Michigan, 1846, ch. 134, sec. 9, p. 578; by the Code of Georgia, sec. 3935; by the Revision of New Jersey, p. 468; and by the Revised Statutes of New York, 6th ed., vol. 3, p. 875.

In our own State the same proper practice has prevailed. The Acts of 1798, ch. 106, 1809, ch. 125, 1852, ch. 16, secs. 1 and 2, 1853, ch. 238, 1867, ch. 144, and 1876, ch. 373, where all similar designations of the superior authority by which the writ of *habeas corpus* should be issued, and were all constitutional acts.

These illustrations would seem, when taken in connection with the arguments derived from the English and Federal examples to which I have referred, to be sufficient answer to the first inquiry.

3. The Act of 1880, ch. 6, is not unconstitutional, because it abridges any of the powers of a Judge as conservator of the peace throughout the State, under Art. 4, sec. 6, of the Constitution, because the power to grant the writ of *habeas corpus* is not a power incident to the office of conservator of the peace. There is no difficulty in determining the functions and powers of a conservator of the peace. Before the enacting of the statute of 1 Ed., 3, ch. 16, and under the common law, there were divers persons whose duty it was to keep the peace. Some had that charge as incident to the office which they held; some by tenure, as holding lands of the King by this service, and some had it simply and of itself, and were

named warders and conservators of the peace.   2 *Jacobs'
Law Dict.*, 25, 26.

In the first class were the King, the Lord Chancellor,
or Keeper, the Lord Treasurer, the Lord High Steward of
England, the Lord Marshal of England, the Lord High
Constable of England, all the Justices of the *King's Bench*,
and the Master of the Rolls.   These were conservators of
the peace throughout the whole Kingdom.   The Justices
of the other Courts of Westminster were only so in their
own Courts.   Coroners, sheriffs, constables and tithing
men, were conservators of the peace within their separate
jurisdictions.   In addition to these was another class, who
were named especially for this duty.   *Ibid.*   These were
the "good and lawful" men assigned by the King in each
county to keep the peace, under the Stat. of 1 Ed. 3, ch. 16,
who were afterwards designated as justices of the peace.

These various officers, as conservators of the peace, all
exercised identical powers.   They could command the
peace, award process of the peace, apprehend all breakers
of the peace, and take surety for the peace.   They could
do no more as conservators of the peace.   2 *Jacobs' Law
Dict., title Conservator of the Peace*, 26; 2 *Steph. Comm.*,
682.

At common law neither the King nor Lord Treasurer,
Lord Steward, Lord Marshal, High Constable, nor any
coroner, sheriff, constable or tithing man, nor any private
person assigned to the duty of keeping the peace, could
issue the common law writ of *habeas corpus.*   The indi-
vidual Judges of the Court of King's Bench, though their
authority as conservators of the peace extended, at com-
mon law, through the whole realm, could not issue the
writ of *habeas corpus,* because it was a writ which could
be issued, at common law, by the Court of King's Bench
only *as a Court;* and certainly, therefore, no Judge of
any other Court, nor any of the officers or persons just
referred to, had the power, at common law, to issue this

State *vs.* Glenn.

writ by virtue of the authority vested in them respectively as conservators of the peace. Though it was a writ, which might be used, as all other writs might be, for the conservation of the peace, yet, at common law, it could only be issued by a power competent to issue such particular writ,—that is to say by a *Court* having such particular jurisdiction. Wilmot's observation, which is relied on, was not a judgment, but an argumentative illustration.

No English Statute in force in this State, and no Act of Assembly of this State, has annexed the power of issuing the writ of *habeas corpus* to the office of a conservator of the peace.

It is, for these reasons, most respectfully submitted that the reasoning of the Judge who delivered the opinion in *Ex parte O'Neill*, 8 *Md.*, 229–230, in which he endeavors to maintain the principle that the power of a Judge in this State, to issue the writ of *habeas corpus*, is necessarily deduced from the general authority as a conservator of the peace conferred upon him by sec. 6 of Art. 4 of the Constitution, cannot be maintained. No Court or Judge in England, or in the United States, can claim to exercise the power to issue the writ of *habeas corpus* unless that power is vested in such Court by the common law, or by express statute, or is vested in such Judge by express statute.

4. Art. 4, sec. 20, of the Constitution of 1867, provided that the Circuit Courts to be held in each county of the State should have and exercise, in the respective counties, all the power, authority and jurisdiction, original and appellate, which the existing Circuit Courts of this State then had, and exercised, *or which might thereafter be prescribed by law.* The same provision was made as to the Circuit Courts existing in 1864, by Art. 4, sec. 25, of the Constitution of that year. An identical provision was made in Art. 4, sec. 8, of the Constitution of 1850, under which the jurisdiction of the former County Courts was

devolved on the new Circuit Courts for the counties. And a similar provision was made in the amendment to the State Constitution ratified in 1805, which devolved the jurisdiction of the old County Courts upon the new County Courts created by that amendment. The provisions made by sec. 20 of Art. 4 of the Constitution of 1867, and by the preceding Constitutions, or Constitutional Amendments, to which I have adverted, did not convert any jurisdiction which any preceding Court had acquired by legislation into a new constitutional grant made to its successor; but simply made the newly-created Courts successors to the legislative powers, which such preceding Courts had enjoyed, and left the legislative powers, to which such Courts succeeded, as subject to modification by law in the hands of their new possessors, as they were when first placed by legislation in the hands of their predecessors.

5. The power of appointing justices of the peace within the province was exercised by the Lord Proprietor and those administering the Provincial government, from the earliest period in the history of the Province until the revolution (1751, *ch.* 27, *Bacon's Laws*), under the authority granted by the Charter of the Province, considered in connection with the Stat. of 1 Ed. 3, stat. 2, ch. 16, and 4 Ed. 3, ch. 2, which statutes were in force, to this extent, in the Province of Maryland. *Kilty's Rep.*, 216; *Alexander's British Statutes*, 165, 166. And the power of making such appointments of justices of the peace was devolved upon the Governor of Maryland by sec. 48 of the Constitution of 1776.

Such justices of the peace exercised judicial powers in criminal cases from an early period, as appears in the Acts of 1717, ch. 13, sec. 6; 1723, ch. 16; 1723, ch. 17, sec. 3; 1730, ch. 23; and 1748, ch. 19, sec. 2; and have exercised a large civil jurisdiction since the Act of 1763, ch. 21. They were recognized as proper depositaries of a

portion of the judicial power of the State by Art. 4, sec. 1, of the Constitutions of 1850, 1864 and 1867 ; and, under the provisions in the organic laws thus referred to, it was competent for the General Assembly to confer upon them such civil and criminal jurisdiction as it considered they could fitly discharge. 21 *Md.*, 425 ; 5 *Md.*, 351 ; 17 *Md.*, 336. The General Assembly, therefore, had the power to confer upon them the jurisdiction granted by the Act of 1878, ch. 415, sec. 10.

It had the same power which Parliament possessed, when it conferred, by many statutes, similar, and far more extended jurisdiction upon justices of the peace in England. See statutes referred to in *Paley on Summ. Convict.*, *6th Ed.*, *pp.* 10–12, 3, 718, 719 ; *Queen vs. Chantrell, L. R.*, 10 *Q. B.*, 587, and the summary Conviction Acts of 11 and 12 Vict., ch. 43, and 42 and 43 Vict., ch. 49, enacted in 1879.

Under constitutional provisions identical with our own, justices of the peace have summary jurisdiction in the following States, to try persons for assaults and batteries : *Virginia, Code,* 1873, *Title* 16, *ch.* 48, *sec.* 9, *p.* 464 ; *Maine, Revised Statutes,* 1871, *ch.* 132, *sec.* 4, *p.* 875 ; *Rhode Island, Public Laws,* 1852, *p.* 403, *sec.* 140 ; *Massachusetts, General Statutes,* 1860, *ch.* 120, *sec.* 38, *p.* 608 ; *Pennsylvania, Brightly's Purdon's Digest, Title Crim. Proc., secs.* 85 *and* 86, *pp.* 396, 397 ; *Wisconsin, Statutes,* 1871, *ch.* 183, *sec.* 1, *p.* 1954 ; *Illinois, Rev. Stats., ch.* 38, *sec.* 381, *p.* 400 ; *Indiana, Statutes, vol.* 2, *p.* 645, *sec.* 1, (1862 ;) *Michigan, Rev. Stats.,* 1846, *ch.* 94, *sec.* 1, *p.* 417 ; *North Carolina, Battle's Revisal,* 1873, *ch.* 33, *secs.* 114, 115, *pp.* 344, 345 ; *Texas, Hartley's Digest,* 1850, *Art.* 1712, *p.* 525, *and Art.* 1715, *p.* 526 ; *New Hampshire, Revised Stats.,* 1843, *ch.* 218, *sec.* 1, *p.* 443 ; *California, Stats. of Cal.,* 1871–2, *ch.* 86, *p.* 84.

In the following States justices of the peace have power to try persons charged with petit larcenies : *Virginia,*

*Code,* 1873, *Title* 17, *ch.* 48, *sec.* 8, *p.* 464; *Maine, Rev. Stats.,* 1871, *ch.* 132, *sec.* 3, *p.* 875; *Vermont, Gen. Stats.,* 1862, *Title* 34, *ch.* 113, *sec.* 14, *p.* 669; *Rhode Island, Public Laws,* 1852, *p.* 403, *sec.* 141; *Massachusetts, Gen. Stats.,* 1860, *ch.* 120, *sec.* 41, *p.* 609; *New Jersey, Rev. Stats., p.* 273, *sec.* 37; *Pennsylvania, Brightly's Purdon's Digest, Title Crim. Proc., secs.* 85, 86, *p.* 396, 397; *Wisconsin, Stats.,* 1871, *ch.* 165, *sec.* 18, *p.* 1841; *Michigan, Rev. Stats.,* 1846, *ch.* 94, *sec.* 1, *p.* 417; *North Carolina, Battle's Revisal,* 1873, *ch.* 33, *secs.* 114, 115, 120, *pp.* 344, 345; *New Hampshire, Laws of* 1847, *ch.* 502, *secs.* 1 *and* 2, *p.* 474; *California, Stats.,* 1871–2, *ch.* 86, *p.* 84.

In Maine a justice may commit vagabonds to the House of Correction. *Rev. Stats.,* 1871, *Title* 12, *ch.* 141, *sec.* 4, *p.* 918. In New Jersey he may commit disorderly persons to the work-house. *Rev. Stats., p.* 306, *sec.* 10. In Pennsylvania he may convict and sentence tramps, as guilty of a misdemeanor, to the jail or work-house. *Act of* 1879, *No.* 31. In West Virginia he has concurrent jurisdiction with the Circuit and County Courts of offences, when the punishment is limited to a fine not exceeding ten dollars, or to imprisonment not exceeding ten days. *Rev. Stats.,* 1879, *ch.* 110, *sec.* 148, *p.* 718. In Iowa he may try all offences, less than felonies, when the punishment does not exceed one hundred dollars as a fine, nor more than thirty days as imprisonment. *Code,* 1873, *ch.* 52, *sec.* 4660, *p.* 717. In Illinois he has original jurisdiction in all cases of misdemeanor punishable by fine only, when the fine does not exceed two hundred dollars, *Rev. Stats.,* 1877, *ch.* 38, *sec.* 38 !, *p.* 400, and may commit vagabonds. *Ibid, p.* 388, *sec.* 271. In New York he may commit vagrants for six months. *Rev. Stats., 6th Ed.,* 836, 837, and disorderly persons to jail in default of sureties. *Rev. Stats., 6th Ed., vol.* 2, *ch.* 20, *sec.* 2, *p.* 893. In Pennsylvania he may summarily and constitutionally convict professional thieves. 1 *Brightly's Purdon's Digest, p.* 346, *sec.* 158;

*Byers vs. Comm.*, 42 *Penn. St.*, 89. In Connecticut he may convict for offences punishable by a fine of not more than seven dollars, nor by imprisonment for more than thirty days. *Connecticut, General Revision of* 1875, *Title* 20, *ch.* 13, *part* 2, *sec.* 1, *p.* 532; *Proffatt on Jury Trial, secs.* 95, 96.

In the following cases, statutes under which powers of summary conviction were given to justices of the peace, without the intervention of a jury, have been expressly held to be constitutional. *Shafer vs. Mumma*, 17 *Md.,* 236; *People vs. Forbes*, 4 *Parker, C. R.*, 611; *People vs. McCarthy*, 45 *How. Pr.*, 98; *Duffy vs. People*, 6 *Hill,* 75; *People vs. Phillips*, 1 *Parker C. R.*, 95; *State vs. Maxcy*, 1 *McMullan*, (*S. Ca.*,) 501; *Byers vs. Comm.*, 42 *Penn. St.,* 89; *Beers vs. Beers*, 4 *Conn.*, 535; *Murphy vs. People*, 2 *Cowen*, 815; *Timms vs. State*, 26 *Ala.*, 165; *State vs. Conlin*, 27 *Vermont*, 318; *McGear vs. Woodruff*, 33 *N. J. Law*, (4 *Vroom*,) 213; *Wharton's Crim. Plead. and Prac. 8th Ed.*, 1880, *sec.* 80. In England it was never supposed that such powers were in violation of any right of the subject.

6. The Act of 1878, ch. 415, sec. 10, does not deprive an habitually disorderly person, arrested under its provisions, of the privilege of trial by jury, if he sees proper to demand that he shall be so tried.

In our State Constitution of 1776, Declaration of Rights, Art. 19, and in the same Article of the Constitution of 1851, and in Art. 21 of the Constitutions of 1864 and 1867, it is provided that in all criminal prosecutions every man has a right to a speedy trial by an impartial jury. The same provision exists in the Constitutions of all the States to which we have referred. Although it is not material to the argument, it ought to be observed here that this provision, made in our State Constitutions since 1776, must, in view of the power of summary conviction existing in justices of the peace, when the Constitution of

1776 was adopted, and conferred upon them subsequently by statutes posterior in date under later Constitutions, be taken to be applicable only to prosecutions for offences which were indictable at common law, or which were, or might be made, by statute, punishable by indictment only. *Proffatt on Jury Trial, sec.* 95 ; *Sedgwick on Stat. and Const. Law, 2nd Ed.,* 487, *note* ; *Cooley on Const. Lim., 2nd Ed.,* 319.

If this reasonable construction, adopted by the Courts in England and in sister States, be deemed too narrow, it is submitted that there is no provision in the tenth section of the Act of 1878, ch. 415, which deprives an accused person of any constitutional right. He can obtain information of the accusation against him. He can procure from the justice a copy of the charge. He can claim to be confronted with the witnesses against him. He can demand from the justice that process be issued to secure the attendance of his witnesses. He may have the witnesses for and against him examined upon oath ; and if he prays, when brought before such justice, an appeal to the Circuit Court for the County in which he has been arrested, or to the Criminal Court of Baltimore, if he has been arrested in that city, he can, by being committed to jail, or held to bail, to answer for his offence in the Court to which he has appealed, obtain the benefit of a jury trial in such Court. Every constitutional right which he can claim is fully provided for. *Stewart vs. Mayor and City Council of Baltimore,* 7 *Md.,* 512; *Beers vs. Beers,* 4 *Conn.,* 535 ; *Proffatt on Jury Trials, sec.* 101.

The right of appeal thus granted was intended to be a substitute for the ordinary remedy by *certiorari* for removing a case from an inferior jurisdiction into a Superior Court, which had jurisdiction of the same subject matter. *Evans' Prac.,* 499, 500. It affords a means of obtaining a trial by jury. *Stewart vs. Mayor and City Council of Baltimore,* 7 *Md.,* 512.

State *vs.* Glenn.

It is a method analogous to that which a traverser may pursue when brought before the Criminal Court of Baltimore, on a Saturday, on a commitment, or recognizance, for a small offence punishable by fine or imprisonment. Such traverser, by praying a jury trial, may appeal from a Judge who is authorized to try his case without the intervention of a jury, to the Court exercising its general criminal jurisdiction, attended by its Grand and Petit Juries. Public Local Laws, Art. 4, secs. 177–183; Act of 1839, ch. 106. *Shafer vs. Mumma,* 17 *Md.,* 336; *Stewart vs. Mayor and City Council of Baltimore,* 7 *Md.,* 512.

If a traverser, who is made by law amenable to the jurisdiction of a justice of the peace submits to trial before such justice, he waives his right to trial by jury, and the justice has power to proceed to his trial and conviction, if the proof be sufficient. *Gambrill vs. Barker,* 31 *Md.,* 5, 6.

7. Under the common law appeals in cases of summary conviction were not matters of common right. They were granted by special statutory provisions. 1 *M. & S.,* 448; 6 *East,* 514; 2 *T. R.,* 509–510; 3 *D. & R.,* 35; 4 *B. & Ald.,* 521; *Macnamara's Paley on Summ. Convic.,* 6th ed., 358. When no such appeal was provided for, summary convictions under statutes could only be reviewed by being removed upon *certiorari* into the proper superior Court. *Macnamara's Paley on Summ. Convic.,* 422. For no writ of error would lie upon a summary conviction. *Ibid,* 422; *Fortes.,* 173; *Comb.,* 297; *Dalton, C.,* 195; 4 *B. & Ald.,* 86.

When a prisoner is in custody under a sentence and commitment, authorized by the Act of 1878, ch. 415, sec. 10, a constitutional statute, and such statute provides for an appeal, which fulfils all the functions of a *certiorari,* a complete remedy is provided, which preserves every constitutional right which an accused person may be entitled to. In such a case the prisoner, if he was tried in Balti-

more City, cannot, if he neglects to avail himself of the remedy provided by statute, obtain a review of the proceedings, under which he is held, by applying for a writ of *habeas corpus* to the Judge of a different judicial circuit.

It did not follow from the absence of any mention in the commitment that the prisoner had waived his right of appeal or of a jury trial, that there was not other sufficient evidence of her waiver of such rights during the proceedings in the cause.

"Wherever there is a jurisdiction created with power to fine and imprison, that is a Court of record, and what is there done is matter of record." *Groenvelt vs. Burwell*, 1 *Salk.*, 200, HOLT, C. J. And whether the prisoner had waived such right or not could only be seen by the whole record.

Judge YELLOTT had no power to command that such record should be brought before him; and, if it had been brought before him, he would not have had the power to examine it, or set aside the conviction. No Court in England, in a similar case, could do this except the Court of King's Bench, even prior to the statute of 36 and 37 Vict., ch. 66, sec. 34; *Macnamara's Paley on Summ. Conv.*, *4th Ed.*, 1856, *p.* 338; though the justice who had acted was within the general territorial jurisdiction of such Court. It certainly cannot be pretended that any Circuit Court, or any Judge of any Circuit Court in this State, can, in the absence of express statutory power, exercise such extra-territorial powers. Judge YELLOTT, therefore, had no power to assume jurisdiction over the record of the trial of the accused, and to declare her trial, conviction and imprisonment to be unlawful.

The limit of the power to be exercised under the writ of *habeas corpus* in this country is expressed by the Supreme Court in *Seibold's Case*, 100 *U. S. Rep.*, 375. That Court said: "There are other limitations of the jurisdiction,

however, arising from the nature and objects of the writ itself, as defined by the common law, from which its name and incidents are derived. It cannot be used as a mere writ of error. Mere error in the judgment of proceedings, under and by virtue of which a party is imprisoned, constitutes no ground for the issue of the writ. Hence, upon a return to a *habeas corpus,* that the prisoner is detained under a conviction and sentence by a Court having jurisdiction of the cause, the general rule is that he will be instantly remanded. No inquiry will be instituted into the regularity of the proceedings *unless, perhaps, where the Court has cognizance by writ of error or appeal to review the judgment.* In such a case, if the error be apparent and the imprisonment unjust, the appellate Court may, perhaps, in its discretion, give immediate relief on *habeas corpus,* and thus save the party the delay and expense of a writ of error. *Bac. Abr., Hab. Corp. B.,* 13; *Bethel's Case, Salk.,* 348; 5 *Mod.,* 19. But the general rule is, that a conviction and sentence by a Court of competent jurisdiction is lawful cause of imprisonment, and no relief can be given by *habeas corpus.* The only ground on which this Court, or any Court, without some special statute authorizing it, will give relief on *habeas corpus* to a prisoner, under conviction and sentence of another Court, is the want of jurisdiction in such Court over the person or the cause, or some other matter rendering its proceedings void."

ALVEY, J., delivered the opinion of the Court.

This case is brought into this Court under the 3rd section of the Act of 1880, chapter 6.

It appears that, upon due information made, a person by the name of Mary or Margaret Glenn was arrested and taken before a justice of the peace, acting as a police justice, in the City of Baltimore, charged with being habitually a disorderly person, leading a dissolute and dis-

orderly course of life.   Upon trial and examination, the party was convicted, and sentenced by the justice to the Maryland House of Correction, located in Anne Arundel County, for the period of six months, the commitment bearing date the 14th day of May, 1880.   On the 29th of May, 1880, a writ of *habeas corpus* was issued by Judge YELLOTT, one of the Associate Judges of the Third Judicial Circuit of the State, composed of the counties of Baltimore and Harford, directed to the superintendent of the House of Correction, requiring him to produce the body of Mary or Margaret Glenn, together with the cause of her detention, on the 10th of June thence ensuing.   The superintendent made due return to the writ, produced the body of the prisoner as he was required, together with a copy of the commitment as cause and justification of her detention.   The commitment states upon its face, that information had, in due form, been made; that the prisoner had been produced before the justice, and that upon examination, it had been fully proven that the prisoner was a vagabond, and a disorderly person as charged, and not insane; whereupon she was convicted "of being deemed and of being an habitually disorderly person in this, that she leads a dissolute and disorderly course of life;" wherefore she was sentenced to the House of Correction for the period of six months.   This conviction and commitment are founded on the 10th section of the Act of 1878, ch. 415, which provides "that it shall be the duty of any justice of the peace of this State to cause to be arrested, and, on due proof, to commit any vagrant, habitually disorderly person (not insane,) to said House of Correction for a period not less than two months nor more than six months."

The Judge upon the return to the writ of *habeas corpus*, adjudged the prisoner to be entitled to her discharge, and, accordingly, discharged her, upon the ground, that it is not competent for the Legislature to confer jurisdiction upon a justice of the peace to try and convict a party

charged with an offence such as that with which the prisoner was charged. In other words, the Judge held that the jurisdiction under which the prisoner had been convicted was unconstitutionally conferred, and therefore the conviction was simply a nullity; and if he be right in this conclusion, the prisoner was certainly properly discharged.

As the case is presented to this Court, four questions arise for consideration:

1st. Whether the case is properly before this Court for review? and if it is,

2nd. Whether the Judge below had power and jurisdiction to issue the writ of *habeas corpus.* to the keeper of a prison located beyond the limits of the Circuit in which he is Judge?

3rd. Whether the Legislature can, constitutionally, confer summary jurisdiction upon a justice of the peace to try and convict a party for an offence, such as that with which the prisoner was charged? and,

4th. Whether, by the nature and extent of the jurisdiction exercised upon *habeas corpus*, the prisoner was properly discharged?

1. The first of these questions depends upon the construction of the third section of the Act of 1880, ch. 6. That section provides, that whenever any Court or Judge, *having jurisdiction in the premises*, shall release or discharge a party on *habeas corpus*, charged with the violation of any statute of this State, upon the ground that such statute is unconstitutional and void, in whole or in part, because contrary to the Constitution of the State, or of the United States, it shall be the duty of the Court or Judge so ordering the discharge, to reduce his opinion to writing within five days after such discharge, and to *transmit the original papers* in the case, together with a copy of the order of discharge, and of his opinion, under his hand and seal, to the clerk of this Court; and that

it shall be the duty of this Court "to consider the papers so transmitted to its clerk, including said order of release or discharge, and said opinion, at the earliest practicable period after the receipt thereof by the clerk, and to give its opinion in writing *upon the case so presented;* and the said opinion so given shall have and possess the same authority as if the same was filed in a case formally heard and determined in said Court on appeal."

The mode here adopted of bringing a case into this Court is certainly very much out of the ordinary course and it is not at all to be commended. This is not a Court of original jurisdiction, and no informal or unusual mode of presenting cases for its consideration can make it so. *Ex parte O'Neill,* 8 *Md.,* 227; *State vs. Shields,* 49 *Md.,* 301. It would certainly have been much better, as has been practically illustrated by what has occurred in this case, if, instead of requiring the Judge to certify the original papers to this Court, he had been required to file the papers in the proper clerk's office in the county where the proceedings took place, and the clerk had been required to send up a transcript, as contemplated by the Constitution, Art. 4, sec. 18, and the rules made in pursuance thereof. But whatever may be thought of the mode adopted, we can have no doubt of the competency of the Legislature to prescribe it. It could certainly require the Judge to certify his judicial acts or proceedings to this Court for review; and though no formal or regular appeal is required to be entered from the order of the Court or Judge below, yet, as the case must be heard here as upon an appeal, at the instance of the State, the directions of the statute to transmit the proceedings must be taken in lieu of the formal entry of an appeal. There is no mutuality in the right of appeal, it is true, as given by the statute (the Court or Judge being required to transmit the papers to this Court only in the event of the discharge of the prisoner for the reasons stated;) but while that may

State *vs.* Glenn.

give rise to unfavorable criticism as to the justness of the provision, it does not affect the question of legislative power, with which we have to deal. The case being legally before us, the judgment of this Court is to be taken to be final and conclusive as in other cases of appeal. *Const., Art. 4, sec.* 15. If the time for which the party was committed has expired, the judgment of reversal may be without effect in the particular case; but if the time has not expired, he would be liable to re-caption.

2. The next question arises under the first and third sections of Article 43 of the Code, as amended and re-enacted by the first section of the Act of 1880, ch. 6. And this question is, whether it be competent to the Legislature to curtail and restrict the power and jurisdiction of the several Judges of the State, as heretofore exercised, over the subject of the writ of *habeas corpus.*

The first and third sections of the Article of the Code, as amended by the Act of 1880, ch. 6, to which we have already referred, limit and restrain the power and juris-diction of the Circuit Judges in cases of *habeas corpus* to the limits of the judicial Circuit for which they may have been elected; and the power of the Legislature to impose this restriction is supposed to exist in the power to regulate the issuing of the writ; and such power would certainly exist, if there be nothing in the Constitution to inhibit it. The Constitution, Art. 4, sec. 6, provides, that all Judges shall, by virtue of their offices, be conservators of the peace throughout the State; and by sec. 55 of Art. 3, it is provided, that the Legislature shall pass no law suspending the *privilege* of the writ of *habeas corpus.* What constitutes the privilege of the writ,—whether it be the right to it as defined by law at the adoption of the Constitution, or whether it be according to the pleasure of any subsequent Legislature, however restricted that privi-lege might be, may admit of serious question. There is no necessity, however, that we should pass upon that

question in this case.    In the case of *Ex parte O'Neill*, 8 *Md.*, 227, the Court of Appeals, as then constituted, held that it had no original jurisdiction in cases of *habeas corpus*, but that power and jurisdiction to hear and decide upon cases of *habeas corpus* belonged to the individual Judges of the Court, under the Act of 1809, ch. 125, then in force, and also under that provision of the Constitution which declared that all the Judges of the common law Courts of the State should, by virtue of their offices, be conservators of the peace throughout the State.    That construction of the clause in the Constitution was maintained upon the ground, that every case of unlawful imprisonment is a violation of the peace of the State, as well as of the right of the citizen, and that it was within the power of the Judge to use the writ of *habeas corpus* as a means to effect the right of such case.    And if that decision is not to be overruled, it would seem to be conclusive of this question.

It is urged, however, that that decision, so far as it holds that the Judges may exercise jurisdiction over the *habeas corpus*, by virtue of their power as conservators of the peace, is not supported by authority, and should not, therefore, be followed in this case.    But we are not disposed to take that view.    The provision of the Constitution of 1851, in respect to which the decision was made, was incorporated into the Constitution of 1864, and also into the existing Constitution, adopted in 1867, without change or modification in terms, and, of course, with full knowledge of the construction placed thereon by the Court of Appeals.    This subsequent adoption of the provision, with its meaning and import defined, is equivalent to declaring in terms that the Judges should have power in cases of *habeas corpus* co-extensive with the limits of the State; and therefore their power to issue the writ cannot, by an Act of the Legislature, be restricted to the limits of their respective circuits.    With such a construction of the provision of the Constitution, it is no more

competent to the Legislature to so restrict the power to issue the writ of *habeas corpus,* than it would be to deny to the Judges, as conservators of the peace, power to commit offenders or to take their recognizances to keep the peace.

Nor is the construction that a Judge of a superior Court may, by the common law, issue the writ of *habeas corpus* out of Court, by virtue of his powers as a conservator of the peace, so forced or novel, as would seem to be supposed.

In England, by the common law, the Lord CHANCELLOR and all the Judges of the Court of King's Bench, among other high officials, by virtue of their offices, are general conservators of the peace throughout the whole kingdom, and may commit all violators of the peace, or bind them in recognizances to keep it; but the other Judges are only so in their own Courts. 1 *Black. Comm.,* 350. Lord COKE seemed to have supposed, that, at the common law, the *habeas corpus* could only be issued by the Judges of the King's Bench during term-time, but that it could be issued by the Lord CHANCELLOR during vacation. 4 *Inst.,* 81, 182. And such may have been the practice in his day. But in *Jenke's Case,* 6 *How. St. Tr.,* 1189, which occurred in 1676, both Lord Chancellor NOTTINGHAM and the Chief Justice of the King's Bench, refused the writ of *habeas corpus* during vacation, upon the ground of the want of authority. Subsequently, however, the subject underwent most thorough consideration, and in 1758, in their opinions to the House of Lords, a majority of all the Judges held, that, at the common law, any Judge of the Court of King's Bench could, during vacation, by his simple *fiat,* direct the issue of the writ; and in *Crowley's case,* 2 *Swanst.,* 1, Lord ELDON, in perhaps the most celebrated opinion of his judicial life, and after the most thorough investigation, held that the Lord CHANCELLOR could issue the writ of *habeas corpus,* at common law, in vacation ; and

thus overruled the decision of Lord Chancellor NOTTING-
HAM in *Jenke's Case.* In the reasoning upon the subject
there was a great diversity of views ; but it is really diffi-
cult to determine upon what ground, independently of
the statutes of *habeas corpus* of 16 *Car.* 1, *ch.* 10, and 31
*Car.* 2, *ch.* 2, that either the Judges of the King's Bench
or the Chancellor could issue the writ in vacation, if it
were not by virtue of their powers as conservators of the
peace; and, as it appears, that was one of the grounds
upon which the opinion of Mr. Justice WILMOT (after-
wards Lord Chief Justice of the Common Pleas,) given to
the House of Lords in 1758, in support of the power of
the Judges of the King's Bench, proceeded. *Op. &
Judgts. of Ld. Ch. Justice* WILMOT, *pages* 94, 95.) And
Lord ELDON, in *Crowley's Case, at page* 65, in referring to
this opinion of Lord Chief Justice WILMOT, upon which
he much relies, states, that the Chief Justice " argued
also from the powers of justices of the peace; and it
is to be recollected that the Judges of the King's Bench
are all justices of the peace, though the Judges of the
other Courts are not." Since those opinions it has been
regarded as settled in England, that not only the Lord
Chancellor, but any single Judge of the Court of King's
Bench, may, at the common law, by *fiat*, during vacation,
direct the issuing of the writ to run into all parts of the
Kingdom. The law was so laid down by Blackstone (3
*Comm.*, 131,) and it has been so expressly ruled in the
comparatively recent case of *Leonard Watson*, 9 *Ad. &
El.*, 731. That all conservators of the peace have not
this power is, of course, conceded ; but because some do
not possess it, furnishes no good reason why others may
not. The magistrate, as a conservator of the peace, pos-
sesses more extensive powers than those possessed by an
ordinary constable; and so the powers possessed by the
Judges, under the Constitution, Art. 4, sec. 6, are more
extensive than those possessed by the ordinary justices of
the peace.

It follows, from the views we have expressed, that the attempted restriction upon the power of the Judges over the writ of *habeas corpus* is nugatory and without effect; and that the Judge below had jurisdiction to grant the writ, though directed to the superintendent of a prison beyond the limits of his Circuit. This conclusion, however, in no manner affects the other sections of the Act of 1880, ch. 6.

3. We come now to the third question, and that is one of more than ordinary importance. The prisoner was discharged by the Judge below upon the ground, as it appears in his opinion, that the trial and conviction by the justice of the peace were unconstitutional, and therefore void; that, as held by the Judge, while a party accused of offending against the law may be committed for trial by a justice of the peace, such party cannot be constitutionally and lawfully tried until he has been indicted by a grand jury, and that the trial should be had in a Court of criminal jurisdiction, either before a jury or the Court, at the election of the party accused.

And this broad general proposition is supposed to be maintained, in its application to cases of the nature of the one under consideration, by certain declaratory principles and provisions found in the Declaration of Rights and the Constitution of the State; such as that the people are "entitled to the common law of England, and the trial by jury, according to the course of that law" (*Dec. of Rights, Art.* 5;) "that in all criminal prosecutions, every man hath a right to be informed of the accusation against him; to have a copy of the indictment, or charge, in due time to prepare for his defence, &c., and to a speedy trial by an impartial jury, without whose unanimous consent he ought not to be found guilty." (*Ib., Art.* 21.) "That no man ought to be taken or imprisoned, &c., or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the

State *vs.* Glenn.

law of the land." (*Ib.*, *Art.* 23.) "In the trial of all criminal cases, the jury shall be the judges of law, as well as of fact." (*Const.*, *Art.* 15, *sec.* 5.) All the declatory principles quoted from the present Declaration of Rights are to be found incorporated in all the Declarations of Rights since the foundation of the State government in 1776; and the provision declaring the jury to be judges of the law as well as of the facts, has been a constitutional provision since 1851; though it has been decided to be only declaratory of the pre-existing common law upon the subject. *Franklin vs. State*, 12 *Md.*, 236.

In England, notwithstanding the provision in the *Magna Charta* of King John, Art. 46, and in that of 9 *Hen.* 3, *ch.* 29, which declares that no freeman shall be taken, imprisoned or condemned, "but by lawful judgment of his peers, or by the law of the land," it has been the constant course of legislation in that kingdom, for centuries past, to confer summary jurisdiction upon justices of the peace for the trial and conviction of parties for minor and statutory police offences; and this jurisdiction has been largely increased and extended in modern times, as will be seen by reference to *Burn's Justice*, *tit. Conviction*; *Bacon's Abr.*, *tit. Justice of the Peace*, and *Paley on Summary Convictions*, 5 *Ed.* Work-houses and Houses of Correction, principally occupied by parties convicted by justices of the peace, have been maintained, certainly from the days of Queen Elizabeth to the present, as parts of the police system of that country; and both the jurisdiction and the means of punishment are deemed essential to the good government and well being of society there, and it is not less so here. Mr. Justice BLACKSTONE, whose Commentaries were first published in 1765, in speaking of summary convictions, says: "By a *summary* proceeding I mean principally such as is directed by several Acts of Parliament (for the common law is a stranger to it, unless in the case of contempt,) for the

conviction of offenders, and the inflicting of certain penalties created by those Acts of Parliament. In these there is no intervention of a jury, but the party accused is acquitted or condemned by the suffrage of such person only, as the statute has appointed for his judge. An institution designed professedly for the greater ease of the subject, by doing him speedy justice, and by not harassing the freeholders with frequent and troublesome attendance to try every minute offence." 4 *Com.*, 280. And again, he says: "Another branch of summary proceedings is that before justices of the peace, in order to inflict divers petty pecuniary mulcts, and *corporal* penalties denounced by Acts of Parliament for many disorderly offences; such as common swearing, drunkenness, vagrancy, idleness, and a vast variety of others, for which I must refer the student to the justice-books formerly cited, and which used to be formerly punished by the verdict of a jury in the Court leet." *Ib.*, 281. And Mr. CHITTY, a writer of high repute upon the law of both civil and criminal procedure, in speaking of the former and present rules of construction of the summary proceedings before justices of the peace, and how the superior Courts were formerly inclined to be astute in discovering defects in convictions by justices of the peace, in the exercise of the summary jurisdiction, says: "But these absurdities, the indulgence of which might induce a suspicion that the superior Courts were formerly *jealous* of those inferior jurisdictions, have for some time been abandoned; and now the doctrine is, that whether it was expedient that those jurisdictions should have been erected, was matter for the consideration of the Legislature; but that, as long as they exist, the Courts ought to go all reasonable lengths to support the decisions of justices, especially as in whatever light they were formerly seen, the country are now convinced that in general they derive considerable advantage from the exercise of the powers delegated to justices, and therefore,

in modern times, they have received proper support from
the Courts of law." 2 *Chitty Genl. Pr.*, 130, 131; see
also, *Rex vs. Thompson*, 2 *Durnf. & East*, 18.

At present, in England, the various offences falling
under the heads of idle, vagrant, and disorderly persons,
and made subject to the summary jurisdiction, are defined
and classified, and the punishments prescribed, by Stat. 5
Geo. 4, ch. 83, as amended by Stats. 1 & 2 Vict., ch. 38; 31
& 32 Vict., ch. 52, and 32 & 33 Vict., ch. 99; an analysis
of which is given in 2 *Broom & Had. Com.*, 467.    The
punishment prescribed in those Acts is imprisonment and
hard labor.    The exercise of the summary jurisdiction,
therefore, is not, in England at least, regarded as being in
violation of the fundamental guarantees of the rights and
liberties of the people; and the personal liberty of the
subject at this day is as well and jealously protected in
England as in any other country, where the principles of
*Magna Charta* and of the common law are enforced.

[With us there has been no time since the earliest days
of the colony that the summary jurisdiction by justices of
the peace has not been exercised, in one form or another,
over parties offending against the peace and good order of
society.    This jurisdiction has been exercised, sometimes
under British statutes in force here, but more generally
under statutes passed by the Colonial and State Legis-
latures.    The justice of the peace has always here been
regarded as an important judicial functionary, and a large
portion of the police power of the State has been enforced
through his instrumentality.] He can not only make pre-
liminary examination and commit the party accused for
trial, but he may, in some instances, try, convict, and com-
mit the party accused in execution of his judgment.    If
complaint be made of apprehended injury or breach of the
peace, he can require sureties to be given by the party
proceeded against, and, in default of sufficient sureties,
commit him to prison; and so, where there is a proper

foundation laid, he may require a party to give surety for his good behaviour towards the State and the people generally, under the Stat. 34 Ed. 3, ch. 1, and upon failure so to do he may commit the party to prison.   If there be a forcible entry into and detainer of any lands and tenements, he may, under the Stats. 5 Rich. 2, ch. 1, and 15 Rich. 2, ch. 3, upon conviction, commit the party offending to prison.   These statutes have been in force here from our earliest history, and are still in force ; and we are not aware that it has ever been supposed that their provisions were in any way restrained or controlled by the declaratory provisions in the Declaration of Rights.   There are a great many statutes upon the statute book, relating to a great variety of subjects, prescribing fines, penalties and forfeitures, *as punishment*, for doing or omitting to do certain things ; and by many of those statutes jurisdiction has been given to justices of the peace, from whose judgments no appeal was provided for until within a comparatively recent period.   By the Act of 1777, ch. 6, known as the Fines and Penalties Act, embraced in the 40th Article of the Code, and which Act was passed at the first session of the State Legislature after the adoption of the Declaration of Rights and the Constitution of 1776, power of conviction and imprisonment was conferred on the justices of the peace, without appeal.   It is there provided that all fines, penalties and forfeitures imposed by any law then in force, or any law thereafter to be passed, and where there was no mode of recovery or enforcement designated in the statute, such fines, penalties and forfeitures, if not exceeding five pounds, now one hundred dollars, should be recovered in the name of the State before a justice of the peace, of the county where the offence was committed ; and if such fines, penalties or forfeitures were of greater amount, they should be recovered by indictment or action of debt in the County Court.   And in case of conviction before a justice of the peace, the defendant, upon failure to pay,

was either to be committed to jail, or an execution might go against his property, as the justice might determine. And although, by subsequent statute, the proceeding before the justice for the recovery of fines and penalties is directed to be in form as for the recovery of small debts, yet the recovery is had *as punishment* for an offence against the law of the State, and such offences, in the classification of crimes, are misdemeanors, and may be the subject of indictment, either at common law or by statute, except where the justice is given exclusive jurisdiction; and if the party accused should fail to discharge the recovery rendered against him, he is liable to *imprison-ment,* notwithstanding the abolition of imprisonment for debt. *State vs. Mace,* (5 *Md.,* 337. The statutes of 1781, and 1785, in regard to bastardy may also be mentioned. By those statutes, now forming the 55th Article of the Code, upon the production of the evidence specified, the justice is required to have the party arrested and brought before him, and upon judgment rendered, if the party fails to furnish the security required either to indemnify the county or to prosecute an appeal, he must be committed to prison, irrespective of his inability to furnish the security. These statutes have all co-existed with the several Constitutions of the State; and in the various cases that have occurred, involving their provisions, we have never heard it contended that the proceedings thereby authorized were not constitutional, because the trial by jury was not provided for, either in the first instance or by an appeal. The framers of all our Constitutions were well acquainted with the history of legislation in regard to the exercise of summary jurisdiction, both in England and in this State, and of the needs of society for summary protection against the vicious, idle, vagrant and disorderly portion of its members; and it is difficult to suppose that, by any provision incorporated in those instruments, it was intended to nullify previous legislation, altogether interdict the use

State *vs.* Glenn.

of a long and well-established summary jurisdiction for the protection of society, and thus radically change and seriously impair the whole police system of the State. For if offenders of the class embraced in the Act of 1878, ch. 415, sec. 10, could only be reached by formal indict-ment and trial by jury in the criminal Courts of the State, the formality and delay attending that mode of proceeding would either operate as an immunity to that class of offenders, or an oppression of them in many cases. The parties affected are most generally of the transient pauper class, and if committed for trial, the larger portion of them, not being able to furnish bail, would have to remain in close confinement in the jails, until the time of trial; and this confinement might, and in the counties where Courts are held but twice or three times a year, frequently would, extend to a period greater than that for which they could be consigned to the House of Correction on conviction. This mode of procedure, therefore, would not only prove oppressive in a great many cases to the parties arrested, but it would be exceedingly onerous to the public in the large expense attending the prosecu-tions. And as to the danger of oppression from erroneous summary convictions, all that is removed by the very ample means of relief provided by law.

The meaning of the provisions of the Declaration of Rights would seem to be plain. When it is declared that the party accused has the right to be informed of the charge against him, and to a copy of the indictment or charge, if required, to enable him to prepare for his de-fence, that simply means, that no prosecution can be con-ducted in secret; but that all prosecutions shall be open and public, upon specific charges set forth by way of indictment, or in such other form as the nature of the prosecution may require; and that the party shall not be denied full opportunity to make his defence. And when it is declared that the party is entitled to a speedy trial

State *vs.* Glenn.

by an impartial jury, that must be understood as referring to such crimes and accusations as have, by the regular course of the law and the established modes of procedure, as theretofore practiced, been the subjects of jury trial.   It could never have been intended to embrace every species of accusation involving either criminal or penal consequences.   If that were the construction, then, all cases of contempts, instead of being the subjects of a summary jurisdiction as they have always been treated, could only be tried by jury. [The design, manifestly, of the provisions of the Declaration of Rights to which we have referred, was simply to declare and make firm the pre-existing rights of the people, as those rights had been established by usage and the settled course of law.] If all cases of a penal or criminal nature, where conviction may involve as a consequence, either directly or alternatively, the imprisonment of the party, must be tried upon indictment and by jury, how is the police power in the hands of the various municipal corporations to be enforced?   If the State has no power to provide by law for the summary trial and conviction of vagrant and disorderly persons by justices of the peace, it would clearly follow that no such power could be granted to be exercised under charters or ordinances of municipal corporations; and the consequence would be that, for the violation of all mere police ordinances, prescribing penalties for their infraction, it would be the right of the party accused to insist upon indictment and trial by jury. Such· a mode of proceeding, if it were practicable, has never been contended for; nor could such contention be maintained for a moment.

We are therefore of opinion that the provision of the Act of 1878, ch. 415, sec. 10, conferring jurisdiction upon justices of the peace to try, convict, and commit to the House of Correction, vagrant and habitually disorderly persons, is constitutional, and that the Judge below was in error in holding otherwise.

4. The next and last question is, what was the nature of the jurisdiction exercised by the Judge below, and what was the scope aad extent of the inquiry opened before him, upon the return to the writ of *habeas corpus*?

The writ of *habeas corpus* is a high prerogative writ, given by the common law, and made effective and enforced by statute, the great object of which is the liberation of parties who may be imprisoned or detained without sufficient cause. By the command of the writ the party to whom it is directed is required to produce not only the body of the party detained, but the date and cause of the caption and detention, in order that the Court or Judge may examine and determine whether the cause or commitment be legal and sufficient for the detention complained of. In this case, the superintendent of the House of Correction, in obedience to the writ, produced the body of the prisoner, and made return to the writ, and exhibited, as part of the return, the commitment of the justice before recited. There was no other proceeding produced on the return of the writ. The record of conviction was not before the Judge, nor was evidence offered of the guilt or innocence of the prisoner. The case was heard and determined upon the return to the writ alone. And hearing the case on such return, in a case like the present, where the party has been committed in execution of a sentence, the sole inquiry is, generally, whether the justice making the commitment had jurisdiction of the offence recited, and of the person of the party accused ; and whether the judgment or sentence recited in the commitment be such · as the justice was authorized by law to render or impose. We have determined that the justice had jurisdiction of the offence, with the power to try, convict and commit therefor ;. and the commitment in this case reciting the conviction, that conviction must be presumed to be lawful and proper until the contrary is made to appear. Upon no other principle could proceedings of this character be

made effectual. As a general proposition, therefore, in such cases as this, mere errors or irregularities, if there be any, committed by the justice within the sphere of his jurisdiction, cannot be inquired into collaterally on *habeas corpus.* The writ of *habeas corpus* cannot be made, unless it be by express statute, to perform the functions of a writ of error, in bringing under review a judgment or sentence of a competent tribunal, simply for errors or irregularities in the proceedings, or in the rendition of the judgment or sentence; that must be done by some more direct and appropriate proceeding. *Bell vs. The State,* 4 *Gill-*301, 305; *Rex vs. Suddis,* 1 *East,* 306; *Ex parte Watkins,* 3 *Pet.,* 193; *Ex parte Reed,* 100 *U. S.,* 13, 23. An im, prisonment, under a sentence by a Court or magistrate of competent jurisdiction, is not unlawful, unless the sentence, for some cause to be made apparent, be not merely erroneous but an absolute nullity; though if it be shown to be such nullity, the party is entitled to his immediate discharge. 4 *Gill,* 305; 3 *Pet.,* 193; 100 *U. S.,* 23; *Comm. vs. Leckey,* 1 *Watts,* 66.

Whatever may have been the former doctrine of construction as applied to commitments *in execution* by magistrates or tribunals of *special and limited* jurisdiction, the doctrine is now perfectly well established, that the construction of such commitments must be *liberal* in support of the lawfulness of the exercise of the jurisdiction, when considered on returns to the writ of *habeas corpus.* This is well exemplified in the case of *Rex vs. Suddis,* 1 *East,* 306, to which we have already referred.

In the case of *Rex vs. Rogers,* 1 *Dowl. & Ryl.,* 156, where a prisoner was committed by a justice of the peace, under a warrant of execution, which recited that he had been convicted, as in this case; upon return to a writ of *habeas corpus,* it was objected that the warrant of commitment did not state on its face all the proceedings prescribed by the statute; to which ABBOTT, C. J., speaking

for the Court, replied,—" We are bound to presume, until the contrary is shown, that there has been a good conviction, and that the magistrate has done everything required of him by law;" and in the conclusion of the opinion he said, " as we are bound to presume that there was a good conviction before commitment, I think we ought not to discharge the defendant." And substantially the same proposition was repeated by the Court in the case of *Rex vs. Taylor*, 7 *Dowl. & Ryl.*, 622. See, also, the case of *Brenan & Galen*, 10 *Ad. & Ell. (N. S.,)* 492. For instance, and as an illustration and application of the principle here decided, if the commitment of a magistrate acting under the Act of 1880, ch. 31, should not state on its face that the party had failed to pray a jury trial, (a privilege secured to him by that Act,) no Judge exercising authority under *habeas corpus* would be justified in discharging the party on that ground. He would have no right to presume that the magistrate had not complied with the statute in all respects and afforded the prisoner all the privileges to which he was entitled under the law.

It is competent, certainly, to the prisoner, under the statute, to controvert the facts stated in the return to the writ; and he may, if he can, show that there has been no conviction in fact, or that it is simply void for the want of jurisdiction in the magistrate to make it; but if he desires to go behind the conviction recited in the warrant of commitment to question the regularity of the proceedings upon which the conviction is founded, or to impeach the conviction itself for errors therein, other than the want of jurisdiction in the premises, he should bring up the record of conviction by *certiorari* for examination on the return of the writ of *habeas corpus;* for the latter writ does not bring up the record of conviction, nor does it, ordinarily, open the proceedings upon which the conviction is founded for review. The law in respect to this subject is well stated in *Bacon's Abr., tit. Habeas*

*Corpus, B,* 4, where it is said, "If a person be in custody, and also indicted for some offence in the inferior Court, there must, beside the *habeas corpus* to remove the body, be a *certiorari* to remove the record; for as the *certiorari* alone removes not the body, so the *habeas corpus* alone removes not the record itself, but only the prisoner with the cause of his commitment; and therefore, although upon the *habeas corpus,* and the return thereof, the Court can judge of the sufficiency or insufficiency of the return and commitment, and bail or discharge, or remand the prisoner, as the case appears upon the return; yet they cannot, upon the bare return of the *habeas corpus,* give any judgment, or proceed upon the record of the indictment, *order or judgment,* without the record itself be removed by *certiorari;* but the same stands in the same force it did, though the return should be adjudged insufficient, and the party discharged thereupon of his imprisonment; and the Court below may issue new process upon the indictment." And this applies as well to summary proceedings or convictions before justices of the peace as to proceedings in inferior Courts, where such Courts exist. 2 *Chitty's Genl. Pr.,* 374, 375; *Rex vs. Taylor,* 7 *Dowl. & Ryl.,* 622. But the writ of *certiorari* may not, like the writ of *habeas corpus,* be issued by a Judge, but must be issued upon the order of a Judge or of the Court, by the clerk thereof, under the seal of the Court, and be made returnable into the same Court; and it cannot be directed to any officer or magistrate of inferior jurisdiction beyond the limits of the county from whose Circuit Court it may issue. Therefore, a Judge of the Circuit Court for Baltimore County could acquire no control or jurisdiction over the proceedings of a justice of the peace in Baltimore City, by *certiorari,* in connection with the *habeas corpus.*

Nor does the writ of *habeas corpus* authorized by section 12 of the Act of 1874, ch. 233, bring up those proceedings for review. It is there provided that any person com-

mitted to the House of Correction, by a justice of the peace, may apply to any Judge for a writ of *habeas corpus*, and upon the return thereof, if the Judge "shall deem that there is sufficient ground for so doing, he shall *hear the evidence offered*, and either discharge the applicant *or modify or confirm the commitment.*" This provision must have a reasonable and practicable construction; and, in addition to the regular inquiries open upon the return to the writ of *habeas corpus*, the design of the provision seems to be to furnish the party with the right of a summary and speedy appeal with respect to the merits or facts of the conviction. If the warrant of commitment recites a conviction within the jurisdiction of the justice, the Judge may, if he shall think there is sufficient ground for it, hear evidence, whether it be the same that was offered before the justice of the peace or not; and if he is satisfied that the conviction, and the period of confinement, are right and just, he affirms the commitment and remands the prisoner, or he may modify the commitment as to the time of imprisonment, according to the evidence produced; and if the evidence shows that the party is not guilty, or that he should not have been convicted, he will be discharged. But it could never have been the intention of the Legislature that this investigation or re-trial on appeal, as to the facts of the case, should take place in any remote part of the State beyond the limits of the county or city where the original conviction was had. It was not, certainly, the design that this re-trial of the facts before the Judge should be of an *ex parte* character, and the result be made to depend upon such evidence as the prisoner might think proper to produce. The State, clearly, would have a right to be represented by its prosecuting attorney, to produce witnesses, and cross-examine those produced by the prisoner. If that be so, the only rational construction that can be given the statute is, that this right of re-trial or re-examination on the facts of the

case, upon *habeas corpus*, must take place within the county or city where the original conviction occurred. Otherwise, the State or county would be made to incur great expense, and the witnesses and the parties concerned in the prosecution would be subjected to great trouble and annoyance, in being required to attend (if attendance were practicable at all on such short notice as is usually given in these cases,) the hearings on *habeas corpus*, in remote parts of the State, away from the locality where the original trial was had. This could never have been the intention of the Legislature, and such a construction of the statute would go far to defeat the main object of the House of Correction, and to open the way for the discharge therefrom of all convicts committed thereto by justices of the peace.

Inasmuch, therefore, as the warrant of commitment shows a good and valid conviction, and the Judge below had no power or jurisdiction over the conviction for any errors or irregularities, in the proceedings upon which it was founded, and could not review the facts of the case as upon appeal, but was confined, as the case was presented to him, to the legal sufficiency or insufficiency of the return to the writ of *habeas corpus*, this Court is of opinion, for the reasons stated, that the Judge below was in error in declaring that the trial and conviction of the prisoner were unlawful, and therefore the order of discharge must be reversed, and it is so ordered.

*Order reversed.*

(Filed 7th October, 1880.)