574 A.2d 898

Norma **GLUCKSTERN**

v.

**Richard Lee SUTTON.**

**No. 107, Sept. Term, 1988.**

Court of Appeals of Maryland.

June 7, 1990.

**636**

Evelyn O. Cannon, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Emory A. Plitt, Jr., Asst. Atty. Gen. and Omar Melehy, Staff Atty., on brief), Baltimore, for petitioner.

Witold J. Walczak (Legal Aid Bureau, Inc., on brief), Baltimore, for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL *, JJ.

ELDRIDGE, Judge.

This habeas corpus case presents issues relating to the timeliness of the petitioner's notice of appeal, the right of the petitioner to take an appeal, and the ex post facto clauses of the Maryland and federal constitutions.[1] The ex post facto issue concerns the retroactive application of statutory changes in the requirements for parole from the Patuxent Institution.

---

* Blackwell, J., now retired, participated in the hearing and conference of this case while an active member of this Court but did not participate in the decision and adoption of this opinion.

1. Maryland Declaration of Rights, Art. 17; Constitution of the United States, Art. I, § 10, cl. 1.

## I.

The underlying facts and pertinent statutory background are as follows.

## A.

On March 5, 1974, in the course of a heated argument at the home of his estranged wife's parents, Richard Lee Sutton killed both of his wife's parents with a handgun. On January 10, 1975, in the Circuit Court for Baltimore County, Mr. Sutton was convicted on two counts of first degree murder and two counts of using a handgun in the commission of a felony or crime of violence. He was immediately sentenced to two concurrent terms of life imprisonment for the murders and two concurrent terms of twelve years imprisonment for the handgun offenses, although the twelve year sentences were to be consecutive to the life sentences.

Also on January 10, 1975, the circuit court found that there was reasonable cause to believe that Mr. Sutton was a defective delinquent, and the court ordered that he be delivered to the Patuxent Institution for examination pursuant to Maryland Code (1957, 1971 Repl.Vol.), Art. 31B.[2]

The circuit court on July 17, 1975, following a hearing, found that Mr. Sutton was a defective delinquent within the meaning of Art. 31B, § 5, of the Code as it then read. The court ordered that Mr. Sutton be

"committed to Patuxent Institution for confinement as a defective delinquent for an indeterminate period, without either maximum or minimum limits, and the balance of

---

2. For discussions of the nature of the Patuxent Institution, the "Defective Delinquency Law," and the applicable statutes from time to time, see, e.g., McNeil v. Director, Patuxent Institution, 407 U.S. 245, 92 S.Ct. 2083, 32 L.Ed.2d 719 (1972); Watson v. State, 286 Md. 291, 296–300, 407 A.2d 324 (1979); Williams and Fulwood v. Director, 276 Md. 272, 347 A.2d 179 (1975), cert. denied, 425 U.S. 976, 96 S.Ct. 2178, 48 L.Ed.2d 801 (1976); Herd v. State, 37 Md.App. 362, 377 A.2d 574 (1977); Comment, 22 Am.Univ.L.Rev. 619 (1973).

his sentence is hereby suspended and the defendant shall remain in the custody of Patuxent Institution subject to the provisions of Article 31B of the Annotated code of Maryland."

## B.

Both when Sutton's offenses occurred in 1974, and when he was committed to the Patuxent Institution in 1975, commitments to Patuxent were, as the above-quoted order indicates, for indeterminate periods without maximum or minimum limits and without regard for the length of the sentences initially imposed upon the criminal convictions. A defendant, found to be a defective delinquent and committed to Patuxent, was "no longer ... confined for any portion of said original sentence." Code (1957, 1971 Repl. Vol.), Art. 31B, § 9.[3] For example, a person might be sentenced to a ten year term of imprisonment for a particular offense, but, if he were thereafter committed to Patuxent Institution, he might remain confined for more than ten years and, possibly, for the rest of his life.

On the other hand, the Institutional Board of Review of the Patuxent Institution could parole at any time an inmate serving the indeterminate sentence if the Board found that parole was for the inmate's benefit and the benefit of

---

**3.** Art. 31B, § 9(b), stated as follows:

"(b) *When defendant found to be a defective delinquent.*—If the court or the jury, as the case may be, shall find and determine that the said defendant is a defective delinquent, the court shall so inform the defendant, and shall order him to be committed or returned to the institution for confinement as a defective delinquent, for an indeterminate period without either maximum or minimum limits. In such event, the sentence for the original criminal conviction, or any unexpired portion thereof, shall be and remain suspended, and the defendant shall no longer be confined for any portion of said original sentence, except as otherwise provided herein. Instead, the defendant shall thenceforth remain in the custody of the institution for defective delinquents, subject to the provisions of this article."

society. Code (1957, 1971 Repl.Vol., 1975 Cum.Supp.), Art. 31B, § 13(d).[4] There was no requirement that the Board's decision in favor of parole be approved by any other person or entity.

In 1974 and 1975, an inmate not committed to Patuxent Institution and serving a life sentence at one of the institutions under the control of the Division of Correction was subject to an entirely different procedure with regard to parole. Such person serving a life sentence was not eligible "for parole consideration until he shall have served fifteen years or the equal of fifteen years when considering the allowances for diminution of period of confinement provided for in Article 27, § 700 and Article 27, § 638C...." Code (1957, 1978 Repl.Vol.), Art. 41, § 122(b). The initial decision with respect to his parole was made by the Maryland Board of Parole which, in 1976, was renamed the Maryland Parole Commission. Code (1957, 1978 Repl.Vol.), Art. 41, §§ 108, 110, 115. When an inmate was serving a life sentence, his parole not only had to be authorized by the Board of Parole but also was required to be approved by the Governor. Code (1957, 1978 Repl.Vol.), Art. 41, § 122(b). These provisions concerning the parole of persons committed to the Division of Correction and serving life sentences, including the requirement of gubernatorial approval, are substantially the same today. *See* Code (1957, 1986 Repl.Vol., 1989

---

4. Art. 31B, § 13(d), in 1974 and 1975, provided in pertinent part as follows:

"If the institutional board of review as a result of its review and reexamination of any person believes that it may be for his benefit and for the benefit of society to grant him a ... parole from the institution for defective delinquents, it may proceed to arrange for such ... parole.... The board may attach to any such ... parole such conditions as to it seem wise or necessary...."

The Institutional Board of Review consisted of the Director of the Patuxent Institution, the three associate directors, a University of Maryland Law School professor, a member of the Maryland Bar, and a sociologist who was required to be a faculty member of a Maryland institution of higher education. Code (1957, 1971 Repl.Vol., 1975 Cum.Supp.), Art. 31B, § 12.

Cum.Supp.), Art. 41, §§ 4–504, 4–516.[5]

Article 31B of the Code, relating to Patuxent Institution, was entirely re-written by Ch. 678 of the Acts of 1977. Judge Orth for the Court in *Watson v. State*, 286 Md. 291, 298–299, 407 A.2d 324 (1979), explained the reasons for the changes as follows:

> "Complaints [about Art. 31B], however, did develop, and criticism intensified as the years passed. Dissatisfaction was not with the objectives of the law but with their fulfillment.... [M]any persons found serious fault with the dictate that the defective delinquent was to be confined 'for an indeterminate period without either maximum or minimum limits,' and that '[i]n such event, the sentence for the original criminal conviction, or any unexpired portion thereof, shall be and remain suspended,' so that the defective delinquent would remain in the custody of Patuxent Institution. § 9(b). Thus, it was not unusual for a person to remain in confinement long after his original sentence had expired.

> "The mounting criticism ultimately spurred legislative action. The Defective Delinquent Law was repealed by Acts 1977, ch. 678, effective 1 July 1977. The entire concept of the former law was not entirely abandoned, however. A new Article 31B was enacted, entitled 'Patuxent Institution.' The institution was retained 'to provide efficient and adequate programs and services for the treatment and rehabilitation of eligible persons.' § 2. ' "Eligible person" means a person who (1) has been convicted of a crime and is serving a sentence of imprisonment with at least three years remaining on it, (2) has an intellectual deficiency or emotional imbalance, (3) is likely to respond favorably to the programs and services provided at Patuxent Institution, and (4) can be better

---

5. The principal difference between the law in 1974–1975, and the law today, concerning the parole eligibility of prisoners serving life sentences, is that today certain categories of these prisoners must serve more than fifteen years to be eligible for parole. Art. 41, §§ 4–516(b)(2) and 4–516(b)(3).

rehabilitated through those programs and services than by other incarceration.' § 1(g)."

Probably the most significant change brought about by the 1977 re-writing of Art. 31B was the abolition of the indeterminate sentence concept. Under Code (1957, 1976 Repl. Vol., 1978 Cum.Supp.), Art. 31B, § 11(a), as enacted by Ch. 678 of the Acts of 1977, "[a] person confined at the [Patuxent] Institution shall be released upon expiration of his sentence in the same manner and subject to the same conditions as if he were being released from a correctional facility."

One aspect of the pre–1977 law concerning Patuxent Institution was not substantially changed by Ch. 678 of the Acts of 1977. The Institutional Board of Review of Patuxent Institution retained the exclusive authority to parole a Patuxent inmate, including one serving a life sentence. There was no requirement that the Board's decision to parole a Patuxent inmate serving a life sentence be approved by the Governor or by anyone else.[6]

Ch. 678 of the Acts of 1977, as amended in the course of its progress through the General Assembly, was expressly made retroactive to apply to one in Mr. Sutton's position. By operation of the statute, Mr. Sutton's original life and twelve year sentences were "reimposed." He was, however, retained at Patuxent Institution. *See* Code (1957, 1976 Repl.Vol., 1978 Cum.Supp.), Art. 31B, § 16(b).[7] The

---

6. Code (1957, 1976 Repl.Vol., 1978 Cum.Supp.), Art. 31B, § 11(b)(2), provided in pertinent part as follows:
 "If the board of review concludes that (1) it will not impose an unreasonable risk on society and (2) it will assist in the treatment and rehabilitation of the eligible person, it shall grant a parole from the Institution...."

7. The bill which became Ch. 678, as introduced in the General Assembly, contained a proposed § 16 of Art. 31B which stated that the enactment was "prospective only," that the new statute should apply only to those committed to Patuxent Institution after July 1, 1977, and that former Art. 31B should remain in effect with respect to those committed to Patuxent Institution on or before June 30, 1977. This proposed § 16 was deleted by amendment, and an entirely different

1977 change in Mr. Sutton's sentence, from an indeterminate sentence to the reimposition of sentences of life imprisonment plus twelve years, by itself probably had little or no effect upon his prospects for parole. The reason for this, as pointed out previously, is that the 1977 statute made no substantial change in the requirements for parole from the Patuxent Institution, regardless of whether the sentence was for life or was indeterminate.

The requirements for parole from Patuxent Institution were, however, changed by Ch. 588 of the Acts of 1982. This statute added a sentence to Art. 31B, § 11(b)(2), relating to paroles by the Institutional Board of Review of Patuxent Institution, stating as follows: "An eligible person who is serving a term of life imprisonment shall only be paroled with the approval of the Governor." Similar language was also added to what is now Art. 41, § 4-516(b)(4).[8]

---

§ 16 was inserted in its place. Art. 31B, § 16(b), as enacted, provided as follows:

"(b)(1) Each person committed to the Institution prior to July 1, 1977, shall, within 90 days after July 1, 1977, have the original sentence that was suspended upon his commitment to the Institution reimposed as of the time it was originally entered, with credit for time spent at the Institution.

(2) Each such person shall be released when the reimposed sentence has expired.

(3) Each person whose reimposed sentence has not expired upon its reimposition shall be reevaluated by January 1, 1978, and dealt with in accordance with the provisions of this article, except that such a person may be retained at the Institution notwithstanding that he has less than three years remaining to serve on the reimposed sentence. Any person transferred to the Division of Correction after reevaluation who is eligible for parole consideration by the Maryland Parole Commission upon the date of transfer shall have a hearing in accordance with Article 41, § 110 within 90 days after the transfer."

8. Code (1957, 1986 Repl.Vol., 1989 Cum.Supp.), Art. 41, § 4-516(b)(4) states:

"If eligible for parole under this subsection, an inmate serving a term of life imprisonment and a person serving a term of life imprisonment who is confined at Patuxent Institution as an eligible person shall only be paroled with the approval of the Governor."

Unlike Ch. 678 of the Acts of 1977, Ch. 588 of the Acts of 1982 contained no express language concerning the statute's applicability to persons who were confined at Patuxent Institution prior to July 1, 1982, which was the effective date of Ch. 588. The legislative history of Ch. 588, contained in the file of the Department of Legislative Reference, is also silent on this question. Patuxent Institution and the Governor have apparently administered the statute as if it were applicable to persons whose Patuxent confinement began prior to July 1, 1982. In the instant case, both sides and the circuit court have proceeded upon the assumption that Ch. 588 was intended by the General Assembly to apply to Mr. Sutton and others whose Patuxent confinement pre-dated the statute. Under this assumption, the combined effect of the 1977 statutory change, reimposing a life sentence upon Mr. Sutton, and the 1982 change, requiring gubernatorial approval for parole of Patuxent inmates serving life sentences, obviously affected Mr. Sutton's prospects for parole. This was confirmed by subsequent events.

## C.

On October 4, 1984, the Institutional Board of Review voted in favor of paroling Richard Lee Sutton. The Board's determination and supporting documents were forwarded to the Governor in early 1985. On September 4, 1985, however, the Governor refused to approve the parole. Again on June 5, 1986, the Institutional Board of Review voted to parole Mr. Sutton, and again the Governor refused to approve the parole.

Mr. Sutton, on November 6, 1987, filed in the Circuit Court for Howard County a petition for a writ of habeas corpus, naming as defendant Dr. Norma Gluckstern, then the Director of Patuxent Institution and the Chairman of the Institutional Board of Review. Mr. Sutton requested that the circuit court order his release on parole in accordance with the decisions of the Institutional Board of Review. He contended that the requirement of gubernatorial approval of the parole, as applied to him, violated the ex

post facto clauses of the Maryland Declaration of Rights and of the United States Constitution.

Dr. Gluckstern, on November 8, 1987, represented by the State's Attorney for Baltimore County, answered the petition and filed a motion to transfer the case to the Circuit Court for Baltimore County pursuant to Code (1974, 1989 Repl.Vol.), § 3–702(b) of the Courts and Judicial Proceedings Article, and Maryland Rule Z54.[9] A few days later a judge of the Circuit Court for Howard County signed an order transferring the habeas corpus case to the Circuit Court for Baltimore County.

The Circuit Court for Baltimore County (DeWaters, J.) held a hearing on December 7, 1987. The court filed an opinion and order on January 22, 1988, and an amended opinion and order on January 27, 1988. The amended opinion held that the retroactive requirement of gubernatorial approval "is to the disadvantage of the Petitioner because it creates an additional step which was not required before." The circuit court concluded that, as applied to Mr. Sutton, the requirement of gubernatorial approval violated the ex post facto clauses of the Maryland Declaration of Rights and of the United States Constitution. The court's order, entered on January 27, 1988, "ORDERED that Richard Lee Sutton be released for parole" in accordance with

---

**9.** The pertinent portion of § 3–702(b) and Rule Z54 are to the same effect. Rule Z54 provides as follows:

**"Rule Z54. Discretion to Refer Application to Another Court or Judge.**

"A judge to whom an application for the writ has been made may, in his discretion, refer the application to any court in the judicial circuit in which the person confined was convicted, without taking other action thereon, provided, however, that such an application shall not be referred to any judge who sat at the trial at which the person was convicted, except with the written consent of the applicant or the person confined. A court to which an application for the writ has been referred shall act thereupon forthwith, and shall have no power to further refer or transfer the application. In exercising the discretion granted by this Rule, the judge to whom an application for the writ has been made shall consider the interests and convenience of all parties concerned including the State."

the decision of the Institutional Board of Review in October 1984.

On the following day, in the course of an unrecorded oral conversation among Judge DeWaters, counsel for Mr. Sutton, and an assistant state's attorney who had been representing Dr. Gluckstern, Judge DeWaters apparently suggested to the assistant state's attorney that he contact someone in the Maryland Attorney General's Office and have the Attorney General's Office file a memorandum of law in the case. There is neither a docket entry nor any other writing in the record reflecting this conversation. Our knowledge of it comes from an affidavit filed in this Court by the assistant state's attorney. Counsel for Mr. Sutton does not dispute that the conversation took place.

On February 16, 1988, an assistant attorney general, representing Dr. Gluckstern, filed in the Circuit Court for Baltimore County a memorandum of law arguing that the application to Mr. Sutton of the gubernatorial approval requirement did not violate the ex post facto clauses of the state and federal constitutions. Mr. Sutton filed a memorandum in response.

On March 31, 1988, the circuit court amended its January 27th opinion, and on July 13, 1988, the court amended its January 27th order. Nevertheless the amended opinion and order continued to reflect the circuit court's view that the requirement of gubernatorial approval could not be applied to Mr. Sutton under the ex post facto clauses of the state and federal constitutions. The amended order, filed on July 14, 1988, required the Institutional Board of Review to afford Mr. Sutton another parole hearing and to proceed "solely on the facts and evidence as they existed when the Institutional Board of Review originally considered Petitioner for parole in October of 1984." The order further stated that "[s]hould the Board elect to grant parole to Petitioner, such parole shall not be subject to the approval of the Governor of Maryland as provided in Article 31B...." The amended order continued in pertinent part as follows:

"3. Should the Institutional Board of Review of the Patuxent Institution grant parole to the Petitioner, the Patuxent Institution is free to seek revocation of such parole by the Institutional Board of Review on the basis of any actions or conduct on the part of the Petitioner occurring after October of 1984.

"4. If the Patuxent Institution requests revocation of any such parole of the Petitioner, the Institutional Board of Review shall conduct a hearing on such request in accordance with the provisions of Article 31B of the Code. This Court specifically does not order the release from custody of the Petitioner unless [application for] revocation of parole is not filed immediately after the said parole hearing...."

Dr. Gluckstern filed a notice of appeal within thirty days of the July 14, 1988, order. Mr. Sutton did not file a cross-appeal. He did, however, file in the Court of Special Appeals a motion to dismiss Dr. Gluckstern's appeal on the ground that an order of this nature in a habeas corpus case is not appealable. The Court of Special Appeals, agreeing with Mr. Sutton, dismissed the appeal.

Dr. Gluckstern then filed a petition for a writ of certiorari which we granted. In addition, we granted a stay of the circuit court's order until our decision in the case.

### D.

In this Court, Mr. Sutton initially argues that Dr. Gluckstern's notice of appeal to the Court of Special Appeals was untimely. Next, he argues that no appeal lies from the circuit court's order. Finally, Mr. Sutton contends that, if it is held that the notice of appeal was timely and that the order is appealable, the circuit court's judgment should be affirmed. Dr. Gluckstern maintains that the notice of appeal was timely, that the order was appealable, and that the order should be reversed because the requirement of gubernatorial approval for parole may validly be applied to Mr. Sutton. In addition to these three issues, at

oral argument before this Court a fourth issue was raised and discussed by the parties. That was whether the relief granted by the circuit court, namely the ordering of another parole hearing instead of the release of Mr. Sutton, was obtainable in a habeas corpus proceeding.

Except as set forth above, neither side in this Court complains about the nature of the circuit court's order or about any of its specific provisions. Consequently, except as hereafter discussed, no issues concerning the propriety of the relief granted or concerning any specific provisions of the order are before us.

## II.

Mr. Sutton contends that the amended circuit court order entered on January 27, 1988, was the final judgment in the case, and that there was no stay or any other action taken pursuant to the rules which operated to deprive the January 27th order of finality. Since Dr. Gluckstern's notice of appeal was not filed until more than 30 days after the January 27th order, Mr. Sutton argues that the notice of appeal was untimely. *See* Rule 8-202(a).[10]

Dr. Gluckstern counters with two alternate arguments. *First,* she maintains that a motion under Rule 2-534 to alter or amend a judgment, filed within ten days of the judgment, may be made by the trial judge sua sponte.[11] Dr. Gluckst-

---

**10.** Rule 8-202(a) provides in pertinent part as follows:
 "Except as otherwise provided in this Rule or by law, the notice of appeal shall be filed within 30 days after entry of the judgment or order from which the appeal is taken."

**11.** Rule 2-534 states:
 "**Rule 2-534. MOTION TO ALTER OR AMEND A JUDG-MENT—COURT DECISION**
 "In an action decided by the court, on motion of any party filed within ten days after entry of judgment, the court may open the judgment to receive additional evidence, may amend its findings or its statement of reasons for the decision, may set forth additional findings or reasons, may enter new findings or new reasons, may amend the judgment, or may enter a new judgment. A motion to

ern claims that Judge DeWaters's oral suggestion the day after entry of judgment, that the Attorney General's Office file a memorandum of law, constituted a motion under Rule 2–534. Therefore, under Rule 8–202(c), a notice of appeal need not be filed until 30 days after the disposition of the Rule 2–534 motion.[12] The disposition of the Rule 2–534 motion, according to Dr. Gluckstern, was not until July 14, 1988, and the notice of appeal was filed within 30 days of that date.

*Second*, Dr. Gluckstern argues that the memorandum of law filed by the Attorney General's Office on February 16, 1988, which was within 30 days of the judgment, constituted a timely motion under Rule 2–535(a) to revise the judgment.[13] Dr. Gluckstern recognizes that a motion filed more than ten days after a judgment but within 30 days of the judgment, under Rule 2–535(a), ordinarily does not affect the finality of the judgment or the time for appeal. She points out, however, that where a timely motion under Rule

---

alter or amend a judgment may be joined with a motion for new trial."

**12.** Rule 8–202(c) provides as follows:

"**(c) Civil Action—Post Judgment Motions.**—In a civil action, when a timely motion is filed pursuant to Rule 2–532, 2–533, or 2–534, the notice of appeal shall be filed within 30 days after entry of (1) a notice of withdrawing the motion or (2) an order denying a motion pursuant to Rule 2–533 or disposing of a motion pursuant to Rule 2–532 or 2–534. A notice of appeal filed before the withdrawal or disposition of any of these motions does not deprive the trial court of jurisdiction to dispose of the motion."

See *B & K Rentals v. Universal Leaf Tobacco*, 319 Md. 127, 131–132, 571 A.2d 1213 (1990); *Yarema v. Exxon Corp.*, 305 Md. 219, 241, 503 A.2d 239 (1986); *Unnamed Atty. v. Attorney Griev. Comm'n*, 303 Md. 473, 486, 494 A.2d 940 (1985); *Sieck v. Sieck*, 66 Md.App. 37, 42–44, 502 A.2d 528 (1986).

**13.** Rule 2–535(a) provides as follows:

"**Rule 2–535. REVISORY POWER**

"**(a) Generally.**—On motion of any party filed within 30 days after entry of judgment, the court may exercise revisory power and control over the judgment and, if the action was tried before the court, may take any action that it could have taken under Rule 2–534."

2–535(a) is filed, where there is no notice of appeal filed with 30 days of the judgment, and where the circuit court in fact does revise the judgment, the revised judgment becomes the final judgment in the case. Under this argument also, the revised order filed on July 14, 1988, was the final judgment in the case.

The first theory set forth by Dr. Gluckstern must be rejected. We do agree that the circuit court may sua sponte file a Rule 2–534 motion to alter or amend its judgment. *See Yarema v. Exxon Corp.*, 305 Md. 219, 241, 503 A.2d 239 (1986). *See also Goins v. State*, 293 Md. 97, 111, 442 A.2d 550 (1982); *Scott v. State*, 223 Md. 376, 381, 164 A.2d 716 (1960). Nevertheless, we do not agree that the circuit court's oral statement to counsel on January 28, 1988, was sufficient to constitute a sua sponte motion to alter or amend the judgment. There was nothing in writing and nothing entered on the docket. As we stated in *Brown v. Baer*, 291 Md. 377, 385, 435 A.2d 96 (1981), with regard to a trial judge's alleged oral statement made within 30 days of a final judgment and staying the judgment, "anything other than a *written* extension order or a docket entry prior to the expiration of the thirty-day period is ineffective. . . ." It is important that parties, appellate courts, and others who are interested, be able to determine from the record, with some degree of certainty, whether or not an order constitutes a final judgment. It would be inconsistent with this principle to hold that an oral statement by a trial judge, not reflected in any written order or docket entry, constitutes a motion under Rule 2–534 and thus deprives a judgment of its finality.

On the other hand, we agree with Dr. Gluckstern that the written memorandum filed on February 16, 1988, was a motion under Rule 2–535(a) to revise the judgment of January 27, 1988. While not labeled a motion to revise the judgment, the substance of the memorandum was clearly a request by the defendant to revise the order requiring the

release of Mr. Sutton. It was treated as such by the circuit court and the parties. No one was misled by the caption.

As Dr. Gluckstern filed a timely motion to revise the judgment in accordance with Rule 2–535(a), as there was no timely notice of appeal prior to revision of the judgment, and as the judgment was in fact revised on July 14, 1988, the order entered on July 14, 1988, became the final judgment. The controlling principles were set forth in *Yarema v. Exxon Corp., supra,* 305 Md. at 240–241, 503 A.2d at 250, as follows:

"Rule 2–535(a), formerly numbered Rule 625a, authorizes the circuit court to exercise revisory power over a judgment on a motion filed within thirty days from the judgment. Nevertheless, it is settled that neither the timely filing of a motion to revise a final judgment nor the court's denial of such motion, absent an order staying the operation of the judgment, affects the finality of the judgment or the running of the time for appeal. *Unnamed Atty. v. Attorney Griev. Comm'n,* 303 Md. 473, 484, 494 A.2d 940 (1985); *Hardy v. Metts,* 282 Md. 1, 5, 381 A.2d 683 (1978); *Hanley v. Stulman,* 216 Md. 461, 467, 141 A.2d 167 (1958). But when a motion under Rule 2–535(a) to revise a final judgment is filed within thirty days and the circuit court in fact revises the judgment, and there has been no intervening order of appeal, the prior judgment loses its finality and the revised judgment becomes the effective final judgment in the case. *Unnamed Atty. v. Attorney Griev. Comm'n, supra,* 303 Md. at 484, 494 A.2d 940; *Brown v. Baer,* 291 Md. 377, 387, 435 A.2d 96 (1981)."

Moreover, under circumstances like those in this case, as long as the motion to revise the judgment is filed within 30 days, the revised judgment need not be entered within 30 days of the original judgment. *Brown v. Baer, supra,* 291 Md. at 387, 435 A.2d at 101.

Consequently, Dr. Gluckstern's notice of appeal, filed within 30 days of the revised judgment, was timely.

### III.

This Court has consistently held that statutory provisions like Code (1974, 1989 Repl.Vol.), § 12–301 of the Courts and Judicial Proceedings Article, generally authorizing an "appeal from a final judgment entered in a civil or criminal case," do not apply to habeas corpus cases. An appeal may be taken from a final order in a habeas corpus case only where specifically authorized by statute. *See, e.g., Superintendent v. Calman,* 203 Md. 414, 423–425, 101 A.2d 207 (1953); *Petition of Otho Jones,* 179 Md. 240, 242–243, 16 A.2d 901 (1940); *Annapolis v. Howard,* 80 Md. 244, 245–246, 30 A. 910 (1894); *State v. Glenn,* 54 Md. 572, 593–595 (1880); *Coston v. Coston,* 25 Md. 500, 505–509 (1866); *Bell v. The State,* 4 Gill. 301, 304 (1846).

Two statutes authorize appeals, or applications for leave to appeal, in particular classes of habeas corpus cases. Code (1957, 1986 Repl.Vol.), Art. 41, § 2–210, authorizes an appeal under certain conditions from the denial of a habeas corpus application in an extradition case. Code (1974, 1989 Repl.Vol.), § 3–707 of the Courts and Judicial Proceedings Article, provides for applications for leave to appeal from the denial of relief in habeas corpus cases regarding the right to bail or allegedly excessive bail.[14]

There are two other statutes which relate to the right to appeal in habeas corpus cases. They are § 3–706 of the Courts and Judicial Proceedings Article and § 645A(e) of the Post Conviction Procedure Act, Code (1957, 1987 Repl. Vol., 1989 Cum.Supp.), Art. 27, § 645A(e). In arguing that she is entitled to appeal in the present case, Dr. Gluckstern

---

**14.** Section 3–707 of the Courts and Judicial Proceedings Article was originally enacted by Ch. 392 of the Acts of 1972. The statute was obviously intended to overturn the holding in *Hudson v. Superintendent,* 11 Md.App. 253, 273 A.2d 470 (1971), that there was no right to appeal the denial of a habeas corpus application in regard to bail. *See Washburn v. Sheriff,* 16 Md.App. 611, 298 A.2d 462 (1973); *Long v. State,* 16 Md.App. 371, 297 A.2d 299 (1972); *Lewis v. Warden,* 16 Md.App. 339, 296 A.2d 428 (1972); *Bigley and Fleming v. Warden,* 16 Md.App. 1, 294 A.2d 141 (1972).

relies upon § 3–706 of the Courts and Judicial Proceedings Article. In our view, however, the Court of Special Appeals correctly held that the appeal in this case is not authorized by § 3–706. On the other hand, we hold that the appeal was authorized by § 645A(e).

### A.

 Section 3–706 of the Courts and Judicial Proceedings Article provides as follows:

"(a) *Memorandum to be filed after discharge.*—If a person is released or discharged by a judge under the writ of habeas corpus on the ground that the law under which the person was convicted is unconstitutional, in whole or in part, the judge shall file a memorandum within five days after the release or discharge and transmit it with original papers in the case to the clerk of the Court of Special Appeals.

"(b) *Opinion of Court of Special Appeals.*—(1) The Court of Special Appeals shall consider the memorandum and the original papers at the earliest feasible time and render its opinion.

"(2) The opinion has the same effect as an opinion filed in a case formally heard and determined by the court on an appeal."

As shown by the above-quoted language, the appeal under § 3–706 is an automatic one. It is not necessary that a party file a timely notice of appeal.[15] Moreover, under the plain language of § 3–706, there is an appeal under the statute only when a person is released or discharged "on the ground that the law under which the person was convicted is unconstitutional." Judge DeWaters in the case at bar took the position that § 3–706 was inapplicable because the laws under which Mr. Sutton was convicted (*i.e.*, the laws proscribing murder and use of a handgun in the commission of a felony or crime of violence) were not held

---

**15.** If § 3–706 were applicable to this case, the discussion in Part II of this opinion would, of course, be wholly unnecessary.

unconstitutional. Thus, after the July 14, 1988, order, the original papers were not automatically sent to the Court of Special Appeals in accordance with § 3–706.

What is now § 3–706 was originally enacted in substantially the same language by Ch. 6 of the Acts of 1880.[16] Ch 6, in pertinent part, provided for an automatic appeal to the Court of Appeals

"[w]henever any Court ... or ... judge ... shall release or discharge any person ... under the writ of 'Habeas Corpus,' charged with the violation of ... any act of Assembly of this State, ... upon the ground ... that such act ... is unconstitutional and void, in whole or in part, because contrary to the Constitution ... of this State, or ... of the United States...."

As pointed out by Judge Alvey for the Court in the first case to arise under Ch. 6, *State v. Glenn, supra,* 54 Md. at 594, the automatic appeal is authorized by the statute in a very limited situation, with "the Court or Judge being required to transmit the papers to this Court only in the event of the discharge of the prisoner for the reasons stated." The "reasons stated" were the unconstitutionality of the statute which the prisoner had been charged with violating. In *Glenn,* where the automatic appeal was permitted, the prisoner had been charged under and convicted of violating a statute proscribing disorderly conduct and granting jurisdiction to a justice of the peace, without a jury, to try the charge. A circuit judge, in the habeas corpus proceeding, had ordered the prisoner's release on the ground that the statute under which the prisoner was convicted was unconstitutional under the jury trial clauses of the Maryland Declaration of Rights.

In *Price v. Clawns,* 180 Md. 532, 533, 25 A.2d 672 (1942), Judge Sloan for this Court pointed out that the habeas

---

16. Another portion of Ch. 6 of the Acts of 1880 attempted to restrict the territorial jurisdiction of judges in habeas corpus cases, but that portion was held to be unconstitutional and severable in *State .v. Glenn,* 54 Md. 572, 595–599 (1880).

corpus appeal under Ch. 6 of the Acts of 1880 could be entertained "because the applicant had been convicted and sentenced to the Baltimore City Jail under a statute which in the opinion of the judge hearing the application is void and unconstitutional." *See also Quenstedt v. Wilson*, 173 Md. 11, 14–16, 194 A. 354 (1937); *Day v. Sheriff*, 162 Md. 221, 222–223, 159 A. 602 (1932); *Dougherty v. Superintendent*, 144 Md. 204, 205–206, 124 A. 870 (1923); *Beall v. State*, 131 Md. 669, 670–672, 103 A. 99 (1917). Where habeas corpus appeals were claimed to be authorized by Ch. 6 of the Acts of 1880 and the specific conditions of the statute were not met, this Court has dismissed the appeals. *See, e.g., State v. Musgrove*, 241 Md. 521, 528–529, 217 A.2d 247 (1966); *Petition of Otho Jones, supra*, 179 Md. at 242–243, 16 A.2d at 901–902. *See also Annapolis v. Howard, supra*, 80 Md. at 246, 30 A. at 911; *Superintendent v. Zeserman*, 46 Md.App. 426, 427–429, 418 A.2d 1220 (1980); *State v. Layman*, 28 Md.App. 332, 336–337, 345 A.2d 444 (1975).

Under the clear language of Ch. 6 of the Acts of 1880, now § 3–706 of the Courts and Judicial Proceedings Article, and the cases in this Court, there is an automatic appeal only where a prisoner's release is "on the ground that the law under which the person was convicted is unconstitutional." The laws under which Mr. Sutton was convicted were the common law and statutory provisions proscribing murder[17] and the statute creating the offense of using a handgun in the commission of a felony or crime of violence.[18] Giving the phrase "law under which a person was convicted" its broadest meaning, the category of laws under which Mr. Sutton was convicted might be expanded to include former Code (1957, 1971 Repl.Vol.), Art. 31B, §§ 6–9, providing for the incarceration and examination of a person at the Patuxent Institution to determine if he was a defective

---

17. Code (1957, 1987 Repl.Vol.), Art. 27, §§ 407–412.

18. Art. 27, § 36B(d).

delinquent, and providing for the commitment to Patuxent of defective delinquents.[19] None of these provisions was held to be unconstitutional by Judge DeWaters. His constitutional ruling did not relate to any provision of law which led to Mr. Sutton's incarceration at Patuxent Institution in 1974 and 1975. To hold that this appeal is authorized by § 3–706 would be to emasculate the language of the statute.

### B.

 We now consider whether the appeal was authorized by Art. 27, § 645A(e).

The General Assembly, by Ch. 702 of the Acts of 1945 and Ch. 625 of the Acts of 1947, created a relatively broad right to file an application for leave to appeal in habeas

---

**19.** This broad reading of what is now § 3–706 of the Courts and Judicial Proceedings Article is supported by *Director v. Cash,* 269 Md. 331, 351–352, 305 A.2d 833 (1973), *cert. denied,* 414 U.S. 1136, 94 S.Ct. 881, 38 L.Ed.2d 762 (1974). In *Cash,* the prisoners were incarcerated at Patuxent Institution pursuant to Art. 31B, §§ 6 and 7, which provided for incarceration and examination of persons at Patuxent to determine if they were defective delinquents. The circuit judge in *Cash* held that a portion of Art. 31B, § 6, was unconstitutional. Although Art. 31B, § 6, was not the law under which the prisoners were "convicted" in a literal sense, it was the law which created or gave rise to the incarceration at Patuxent which was the subject of the habeas corpus proceeding. The *Cash* decision was consistent with the language of the Post Conviction Procedure Act at that time. One could bring an action under the Post Conviction Procedure Act if his incarceration resulted either from a conviction in the traditional sense or from a proceeding under then Article 31B. *See* Code (1957, 1971 Repl.Vol.), Art. 27, § 645A(a). *Compare,* however, *McElroy v. Director,* 211 Md. 385, 390–392, 127 A.2d 380 (1956), *cert. denied,* 353 U.S. 903, 77 S.Ct. 673, 1 L.Ed.2d 660 (1957).

A somewhat similar broad reading, without any discussion, had been given to Ch. 6 of the Acts of 1880 in *Wright v. Herzog,* 182 Md. 316, 34 A.2d 460 (1943), where the habeas corpus applicant had been incarcerated for violating a conditional pardon, and the circuit judge held that the conditional pardon statute was unconstitutional.

Whether the *Cash* and *Herzog* holdings concerning appealability were correct, in light of the statutory language, is a matter which we need not decide in this case. Even if correct, those cases do not support the argument that the appeal in the present case was authorized by § 3–706.

corpus cases. Those enactments, as amended by Chs. 399 and 760 of the Acts of 1957, were codified as Code (1957), Art. 42, §§ 6 and 7, which provided as follows:

"§ 6. Appeal.

Any person, including the Attorney General or the State's attorney for Baltimore City or a county, as the case may be, aggrieved by the order of the judge in refusing to issue a writ of habeas corpus, or in discharging or remanding the person seeking said writ, may apply to the Court of Appeals of Maryland for leave to prosecute an appeal therefrom. Said application for leave to prosecute an appeal shall be in such form as the Court of Appeals may, by its rules, prescribe, and in the event that the Attorney General or the State's attorney shall forthwith state his intention to file such application for an appeal, the order discharging the prisoner may be stayed, but the judge may, in his discretion, admit the petitioner to bail for his appearance when required. If the application to prosecute such appeal shall be granted, the procedure thereafter shall be in conformity with the rules of the Court of Appeals. If said application is denied, the order sought to be reviewed shall thereby become final to the same extent and with the same effect as if said order had been affirmed upon appeal."

"§ 7. Cases when §§ 4 to 6 inapplicable.

The provisions of §§ 4, 5 and 6 shall not apply to any case unless the petitioner is detained for or confined as the result of a prosecution for a criminal offense or has been confined as a defective delinquent under the provisions of Article 31B of the Code, title 'Defective Delinquents.' "[20]

Under these provisions, whenever a habeas corpus petitioner was detained or confined as a result of a criminal

---

**20.** The final clause, relating to confinement under Art. 31B, was added by Ch. 760 of the Acts of 1957, and was intended to overturn the holding in *McElroy v. Director, supra,* 211 Md. at 390–392, 127 A.2d at 383–384.

conviction or a defective delinquency proceeding, an application for leave to appeal from the order in the habeas corpus case could be filed by the aggrieved party. Under Art. 42, §§ 6 and 7, the order in the habeas corpus case was subject to an application for leave to appeal regardless of which side prevailed, regardless of whether the issue was a constitutional one, and regardless of whether the challenge was to the original conviction and sentence or was to a later matter.

In 1958 the General Assembly enacted the Post Conviction Procedure Act, Ch. 44 of the Acts of 1958, Code (1957, 1963 Cum.Supp.), Art. 27, § 645A *et seq.* That enactment, for the first time, created a statutory remedy under which a prisoner could collaterally challenge the conviction and sentence, or defective delinquency determination, which led to his incarceration. The Post Conviction Procedure Act also provided that any party aggrieved by the final trial court order in a proceeding under that Act could file an application for leave to appeal. Code (1957, 1963 Cum.Supp.), Art. 27, § 645–I. The purpose of the Post Conviction Procedure Act was to create a simple statutory procedure, in place of the common law habeas corpus and coram nobis remedies, for collateral attacks upon criminal convictions and sentences. *Brady v. State*, 222 Md. 442, 446–447, 160 A.2d 912 (1960); *State v. D'Onofrio*, 221 Md. 20, 28–29, 155 A.2d 643 (1959). Although for constitutional reasons the General Assembly did not restrict the authority of judges to issue writs of habeas corpus,[21] it did in the Post Conviction Procedure Act legislate with regard to appeals in habeas corpus cases.

Ch. 45 of the Acts of 1958 repealed Art. 42, § 6, which had broadly provided for applications for leave to appeal in habeas corpus cases. In addition, Ch. 44 of the Acts of 1958, which enacted the Post Conviction Procedure Act,

---

**21.** *See* n. 16, *supra; State v. Glenn, supra;* Art. IV, § 6, of the Maryland Constitution.

stated in pertinent part as follows (Code ·(1957, 1963 Cum. Supp.), Art. 27, § 645A(b)):

"Hereafter no appeals to the Court of Appeals of Maryland in habeas corpus or coram nobis cases, or from other common law or statutory remedies which have heretofore been available for challenging the validity of incarceration under sentence of death or imprisonment shall be permitted or entertained, except appeals in such cases pending in the Court of Appeals on June 1, 1958, shall be processed in due course."

In light of the reference in the above-quoted language to "the validity of incarceration under sentence of death or imprisonment," and in light of the legislative purpose of substituting the statutory post conviction remedy for habeas corpus where the conviction and sentence leading to incarceration were being collaterally attacked, the language of § 645A(b) might arguably have been construed to abolish habeas corpus appeals only where the purpose of the habeas corpus proceeding was to challenge the original criminal conviction and sentence, or defective delinquency proceeding, which had led to the incarceration. Nevertheless, in dicta and without any discussion, this Court seemed to construe the 1958 enactment as abolishing all appeals in habeas corpus cases except those under Ch. 6 of the Acts of 1880 and those relating to extradition. *Cumberland v. Warden*, 225 Md. 636, 638, 171 A.2d 709 (1961), *cert. denied*, 369 U.S. 855, 82 S.Ct. 941, 8 L.Ed.2d 14 (1962) ("This Court may no longer entertain an appeal from the denial of a petition for a writ of habeas corpus. Article 27, Section 645A(b)"); *Brady v. State, supra*, 222 Md. at 447, 160 A.2d at 915–916 ("the P.C.P.A. ... clearly took away the right of appeal from an order denying" habeas corpus relief). *See also Berman v. Warden*, 232 Md. 642, 644 n. 1, 193 A.2d 551 (1963).

The General Assembly in 1965 added new language to the portion of the Post Conviction Procedure Act relating to appeals in habeas corpus cases. Code (1957, 1987 Repl.Vol., 1989 Cum.Supp.), Art. 27, § 645A(e), as amended by Ch. 442

of the Acts of 1965, now reads in relevant part as follows (new 1965 language underscored):

> "No appeals to the Court of Appeals or the Court of Special Appeals in habeas corpus or coram nobis cases, or from other common-law or statutory remedies which have heretofore been available for challenging the validity of incarceration under sentence of death or imprisonment shall be permitted or entertained, except appeals in such cases pending in the Court of appeals on June 1, 1958, shall be processed in due course. <u>Provided, however, that nothing in this subtitle shall operate to bar an appeal to the Court of Special Appeals (1) in a habeas corpus proceeding instituted under § 2–210 of Article 41 of this Code or (2) in any other proceeding in which a writ of habeas corpus is sought for any purpose other than to challenge the legality of a conviction of a crime or sentence of death or imprisonment therefor, including confinement as a result of a proceeding under Article 31B of this Code."</u>

The only discussion of the 1965 language by this Court was in *State v. Musgrove, supra,* 241 Md. at 527–528, 217 A.2d at 249–250, where the Court held that no appeal was permitted in a habeas corpus case where the prisoner was challenging the examination procedures under Art. 31B which led to his incarceration at Patuxent Institution. Neither *Musgrove* nor any other opinion of this Court has discussed whether the language added to the Post Conviction Procedure Act in 1965 was intended to authorize appeals in habeas corpus cases which did *not* involve challenges to the judgments in criminal cases (*i.e.,* convictions and sentences imposed) or challenges to the examination and defective delinquency proceedings under Art. 31B. Nevertheless, during the period after 1965 and before direct appellate jurisdiction in habeas corpus cases was shifted from this Court to the Court of Special Appeals,[22] this Court did entertain appeals in habeas corpus cases not involving ex-

---

22. Ch. 99 of the Acts of 1970, effective July 1, 1970.

tradition and not involving challenges to judgments in criminal cases or Art. 31B proceedings. *See, e.g., Whiteley v. Warden,* 258 Md. 634, 267 A.2d 150 (1970). Subsequently, however, the Court of Special Appeals, as it did in the present case, has dismissed appeals in this type of habeas corpus case.[23] The Court of Special Appeals' reasoning seems to be that the sole purpose of the 1965 language was to make it clear that appeals could be taken in cases involving extradition and cases under Ch. 6 of the Acts of 1880.

In our view, the language added to the Post Conviction Procedure Act in 1965 was intended to authorize appeals in habeas corpus cases such as the case at bar. The language of Art. 27, § 645A(e), emphasizes that the Post Conviction Procedure Act shall not operate to bar an appeal

"(1) in a habeas corpus proceeding instituted under § 2–210 of Article 41 of this Code or (2) in any other proceeding in which a writ of habeas corpus is sought for any purpose other than to challenge the legality of a conviction of a crime or sentence of death or imprisonment therefor, including confinement as a result of a proceeding under Article 31B of this Code."

Clause (2) of the above-quoted language obviously applies to a case like the present one. Otherwise, the clause would be meaningless.

Immediately prior to the 1965 enactment, only two statutes provided for appeal or leave to appeal in habeas corpus proceedings: what is now Art. 41, § 2–210, relating to extradition cases, and Ch. 6 of the Acts of 1880, relating to orders based on the unconstitutionality of the statute under which the prisoner was convicted. Clause (1) of the 1965 language encompasses the extradition cases, and therefore, those cases are not the object of clause (2). Automatic appeals under Ch. 6 of the Acts of 1880 are also not the

---

**23.** *Superintendent v. Zeserman,* 46 Md.App. 426, 418 A.2d 1220 (1980); *State v. Layman,* 28 Md.App. 332, 345 A.2d 444 (1975); *Hudson v. Superintendent, supra. See* n. 14, *supra.*

object of clause (2). Ch. 6 of the Acts of 1880 covers only constitutional challenges to criminal convictions and Art. 31B examination or defective delinquency proceedings. Clause (2) relates to appeals in cases *"other than "* those challenging criminal convictions or Art. 31B proceedings. Consequently, contrary to the view of the Court of Special Appeals, the purpose of clause (2) was not to make it clear that the Post Conviction Procedure Act did not abolish appeals in habeas corpus cases involving extradition and cases under Ch. 6 of the Acts of 1880. Neither category of cases was encompassed by clause (2). Clause (2) has meaning only if construed as granting a right of appeal in a habeas corpus case not involving a challenge to the criminal conviction and sentence or the Art. 31B proceeding which led to the prisoner's confinement.

Our interpretation of clause (2) is supported by the title of the 1965 bill which added the new language to the Post Conviction Procedure Act, and which was enacted as Ch. 442 of the Acts of 1965. The title of the bill states that one of its purposes was "to enumerate certain classes of habeas corpus cases in which an appeal to the Court of Appeals may be taken." This does not indicate simply a purpose of clarifying existing law. Where, however, other language in Ch. 442 was intended simply to clarify existing law, the corresponding portion of the title expressly stated "To clarify" etc.

Finally, our conclusion is consistent with the purpose of the Post Conviction Procedure Act. As previously discussed, the Act was designed to create a statutory remedy for collateral challenges to criminal judgments and Art. 31B examination and defective delinquency proceedings, and to substitute this remedy for habeas corpus and coram nobis actions challenging criminal judgments and Art. 31B proceedings. In situations where the Post Conviction Procedure Act did not provide a remedy, and thus was not a substitute for habeas corpus, the enactment of the new statute provided no reason for restricting appeals in habeas corpus cases.

The State's appeal in this case, therefore, was authorized by Art. 27, § 645A(e). The Court of Special Appeals erred in dismissing the appeal.

### IV.

In *Director v. Cash*, 269 Md. 331, 350–351, 305 A.2d 833, 844 (1973), *cert. denied*, 414 U.S. 1136, 94 S.Ct. 881, 38 L.Ed.2d 762 (1974), this Court noted the State's argument that relief other than the discharge of the prisoner was not "within the purview of proper relief under a petition for habeas corpus," but the Court found it unnecessary to decide the issue in that case. As mentioned earlier, the same issue was raised at oral argument in the present case.

Preliminarily, we note that the order entered in the instant case on July 14, 1988, clearly contemplated the release of Mr. Sutton in one contingency. Under any reasonable construction of the order, if the Institutional Board of Review, after the new hearing, determines that Mr. Sutton should be paroled, and if an application for "revocation of parole is not filed immediately," Mr. Sutton's release on parole is required.

Moreover, and despite the reservation of the question in *Director v. Cash, supra,* Maryland cases clearly hold that it is not inappropriate in a habeas corpus case to grant relief other than the release of the prisoner. While earlier cases may have taken a narrow view of the relief available in a habeas corpus proceeding, more recent cases hold that the judge is entitled to tailor relief as justice may require.

For example, in *Shipley v. State*, 235 Md. 408, 201 A.2d 773 (1964), the judge in a habeas corpus proceeding had found a constitutional infirmity in the prisoner's original trial and had granted him a new trial. This Court specifically rejected the argument that the grant of a new trial was not proper relief in a habeas corpus proceeding. 235 Md. at 411, 201 A.2d at 774.

In *Beard v. Warden*, 211 Md. 658, 661, 128 A.2d 426 (1957), the Court in an opinion by Judge Hammond held that

a circuit court in a habeas corpus case could order that a prisoner be granted a belated appeal from his original criminal conviction. To the same effect is *Hardy v. Warden,* 218 Md. 659, 662, 146 A.2d 42 (1958).

■ Both the *Beard* and the *Hardy* opinions in this Court cited with approval *Dowd v. Cook,* 340 U.S. 206, 209–210, 71 S.Ct. 262, 264, 95 L.Ed. 215 (1951), where the Supreme Court rejected the contention that a judge in a habeas corpus case was required "to choose between ordering an absolute discharge of the prisoner and denying him all relief." The Supreme Court pointed out that a judge "has power in a habeas corpus proceeding to 'dispose of the matter as law and justice require.'" 340 U.S. at 210, 71 S.Ct. at 264. *See Peyton v. Rowe,* 391 U.S. 54, 66–67, 88 S.Ct. 1549, 1555–1556, 20 L.Ed.2d 426 (1968).

Regardless of whether it was proper under the circumstances of this case, the ordering of a new parole hearing was an available type of relief in a habeas corpus case.

## V.

■ The final issue before us is whether Judge DeWaters correctly held that, under the ex post facto clauses of the federal and state constitutions, the requirement of gubernatorial approval could not be applied to a decision by the Institutional Board of Review to parole Mr. Sutton.

Recently in *Anderson v. Dep't of Health & Mental Hyg.,* 310 Md. 217, 224, 528 A.2d 904 (1987), *cert. denied,* 485 U.S. 913, 108 S.Ct. 1088, 99 L.Ed.2d 247 (1988), we set forth certain principles underlying the federal constitution's ex post facto prohibition:

> "[T]he Supreme Court has enunciated the principle that the prohibition extends broadly to 'any law passed after the commission of an offense which ... "in relation to that offense, *or its consequences,* alters the situation of a party to his disadvantage."' *Kring v. Missouri,* 107 U.S. 221, 235, 2 S.Ct. 443, 455, 27 L.Ed. 506 (1883), quoting Justice Washington in *United States v. Hall,* 2 Wash.C.C.

366, 26 Fed.Cas. 84, 86 (Case No. 15,285) (1809) (emphasis added). The Supreme Court has also pointed to 'the liberal construction which this court ... [has given] to the words *ex post facto* law,—a construction in manifest accord with the purpose of the constitutional convention to protect the individual rights of life and liberty against hostile retrospective legislation.' *Kring v. Missouri, supra,* 107 U.S. at 229, 2 S.Ct. at 450."

We also pointed out in *Anderson* that "the ex post facto clause in the Maryland Declaration of Rights ... has been viewed as having the same meaning as the federal prohibition." 310 Md. at 223, 528 A.2d at 907, and cases there cited.

With regard to retroactive laws changing the consequences of a criminal offense, the ex post facto prohibition has not been limited to laws directly changing the penalty for the offense. Rather, as the Supreme Court has stated, "any law which was passed after the commission of the offence ... is an *ex post facto* law, when it inflicts a greater punishment than the law annexed to the crime at the time it was committed ... *or which alters the situation of the accused to his disadvantage,*" *In re Medley,* 134 U.S. 160, 171, 10 S.Ct. 384, 387, 33 L.Ed. 835 (1890) (emphasis added). Addressing a state statute which did not change the maximum prison term for an offense, but which did change the mandatory character of the term and the provisions for parole, Justice Stone for the Court in *Lindsey v. Washington,* 301 U.S. 397, 400, 57 S.Ct. 797, 798, 81 L.Ed. 1182 (1937), emphasized that "we compare the practical operation of the two statutes as applied to petitioners' offense." He concluded (301 U.S. at 401–402, 57 S.Ct. at 799): "We need not inquire whether this [statutory change] is technically an increase in the punishment annexed to the crime.... It is plainly to the substantial disadvantage of petitioners...."

A recent application of this principle occurred in *Weaver v. Graham,* 450 U.S. 24, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981), involving a state statute altering the availability of "gain

time" for good conduct in prison and applicable to prisoners whose offenses pre-dated . the statute. In considering whether the statute violated the ex post facto prohibition, the Supreme Court initially stated (450 U.S. at 30–31, 101 S.Ct. at 965):

> "Thus, even if a statute merely alters penal provisions accorded by the grace of the legislature, it violates the [Ex Post Facto] Clause if it is both retrospective and more onerous than the law in effect on the date of the offense."

The Court went on to reject the State's argument that the statute changing prison good conduct time was not part of the punishment annexed to the crime, saying (450 U.S. at 31–32, 101 S.Ct. at 966):

> "This contention is foreclosed by our precedents. First, we need not determine whether the prospect of the gain time was in some technical sense part of the sentence to conclude that it in fact is one determinant of petitioner's prison term—and that his effective sentence is altered once this determinant is changed. See *Lindsey v. Washington*, 301 U.S. at 401–402, 57 S.Ct. at 799; *Greenfield v. Scafati*, 277 F.Supp. 644 (Mass.1967) (three-judge court), summarily aff'd, 390 U.S. 713, 88 S.Ct. 1409, 20 L.Ed.2d 250 (1968). See also *Rodriguez v. United States Parole Comm'n*, 594 F.2d 170 (CA7 1979) (elimination of parole eligibility held an *ex post facto* violation). We have previously recognized that a prisoner's eligibility for reduced imprisonment is a significant factor entering into both the defendant's decision to plea bargain and the judge's calculation of the sentence to be imposed. *Wolff v. McDonnell*, 418 U.S. 539, 557, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974); *Warden v. Marrero*, 417 U.S. 653, 658, 94 S.Ct. 2532, 2535, 41 L.Ed.2d 383 (1974). See *United States v. De Simone*, 468 F.2d 1196 (CA2 1972); *Durant v. United States*, 410 F.2d 689, 692 (CA1 1969). Second, we have held that a statute may be retrospective even if it alters punitive conditions outside the sentence. Thus, we have concluded that a statute requiring solitary

confinement prior to execution is *ex post facto* when applied to someone who committed a capital offense prior to its enactment, but not when applied only prospectively."

The Court concluded that the statute altering good conduct time "substantially alters the consequences attached to a crime already completed" and "is disadvantageous to petitioner and other similarly situated prisoners" because it "lengthens the period that someone in petitioner's position must spend in prison." 450 U.S. at 33, 101 S.Ct. at 966–967. The statute, therefore, was held to violate the ex post facto prohibition.

It is significant that the Supreme Court in *Weaver v. Graham, supra,* 450 U.S. at 32, 101 S.Ct. at 966, specifically relied on cases holding that a statute changing parole eligibility, and applied to prisoners whose crimes occurred before the statute, violated the federal constitution's ex post facto clause. Courts generally have held that statutes making parole more difficult to obtain may not, under the ex post facto prohibition, be applied to prisoners whose offenses occurred before the enactment of the statutes. Recently the United States Court of Appeals for the Fourth Circuit, in *Fender v. Thompson,* 883 F.2d 303, 305–306 (4th Cir.1989), reviewed some of these cases:

"Indeed, courts have repeatedly held that 'parole eligibility is part of the law annexed to the crime at the time of a person's offense.' *Schwartz v. Muncy,* 834 F.2d 396, 398 n. 8 (4th Cir.1987). *See also, e.g., Burnside v. White,* 760 F.2d 217, 220 (8th Cir.1985) ('There is no question that a new parole statute may alter the consequences attached to a crime for which a prisoner already has been sentenced; [and] to the degree that a statute does so, it has retrospective effect.'); *Lerner v. Gill,* 751 F.2d 450, 454 (1st Cir.1985) ('parole eligibility is part of the "law annexed to the crime" for ex post facto purposes'); *Beebe v. Phelps,* 650 F.2d 774, 777 (5th Cir. Unit A 1981) ('Since parole eligibility is considered an integral part of any sentence . . ., official port-sentence [sic] action that delays

eligibility for supervised release runs afoul of the *ex post facto* proscription.') (quoting *Shepard v. Taylor,* 556 F.2d 648, 654 (2d Cir.1977)); *Rodriguez v. United States Parole Comm'n,* 594 F.2d 170, 176 (7th Cir.1979) (treating 'possibility of parole as an element of "punishment"'). In turn, they have unvaryingly refused to permit the retrospective application of new or amended statutes or administrative rules which purported, for example, to alter preexisting criteria for the determination of parole eligibility, *Marshall v. Garrison,* 659 F.2d 440, 444–46 (4th Cir.1981); or revoke accrued 'good time' credits upon the revocation of probationary release granted on the sentence for an offense committed before enactment of the statute, *Beebe,* 650 F.2d at 776–77, or, as a practical matter, simply rescind prior parole eligibility altogether. *Rodriguez,* 594 F.2d at 176."

Judge Phillips for the court then concluded in *Fender* (883 F.2d at 306):

"The principle underlying each of these decisions is that the retrospective application of a statute modifying or revoking parole eligibility would, '[f]or prisoners who committed crimes before [the statute's] enactment ..., substantially alter[ ] the consequences attached to a crime already completed, and therefore change[ ] "the quantum of punishment."' *Weaver,* 450 U.S. at 33, 101 S.Ct. at 966–67 (citing *Dobbert v. Florida,* 432 U.S. 282, 293–94, 97 S.Ct. 2290, 2298–99, 53 L.Ed.2d 344 (1977)). That is, of course, what the statute as applied here effectively accomplishes. It is also, however, precisely what the *ex post facto* clause forbids."

For other cases applying the ex post facto prohibition to retroactive statutory changes making parole more difficult, in addition to the cases cited in *Fender, see, e.g., Love v. Fitzharris,* 460 F.2d 382 (9th Cir.1972), *remanded as moot,* 409 U.S. 1100, 93 S.Ct. 896, 34 L.Ed.2d 682 (1973); *In re Griffin,* 63 Cal.2d 757, 48 Cal.Rptr. 183, 408 P.2d 959, 962 (1965); *State v. Hillis,* 748 S.W.2d 694 (Mo.App.1988); *State v. Beachman,* 189 Mont. 400, 616 P.2d 337, 340–341

(1980); *Goldsworthy v. Hannifin,* 86 Nev. 252, 468 P.2d 350, 352 (1970); *Ex Parte Alegria,* 464 S.W.2d 868, 874 (Tex.Cr.App.1971); *State ex rel. Mueller v. Powers,* 64 Wis.2d 643, 646, 221 N.W.2d 692 (1974).

In view of the foregoing cases, it is clear that the requirement of gubernatorial approval for parole by the Institutional Board of Review cannot be applied to Mr. Sutton. Under the statutory scheme in 1974 when his offenses were committed, Mr. Sutton faced the possibility of being adjudicated a defective delinquent, of being sentenced to the Patuxent Institution for an indeterminate term, and of being paroled upon the sole decision of the Institutional Board of Review. In 1975, this possibility became a reality, and Mr. Sutton was determined to be a defective delinquent, was sentenced for an indeterminate term, and could have been paroled based upon the decision of the Institutional Board of Review and no one else. The combined effect of the 1977 and 1982 statutory changes, as applied to Mr. Sutton, was obviously to make parole more difficult to obtain. He now needs the favorable decisions of both the Institutional Board of Review and the Governor in order to be paroled. Moreover, subsequent events have shown that obtaining parole has in fact become more difficult. The retroactive application of the 1977 statute which reimposed a life sentence upon Mr. Sutton, and the 1982 statute requiring gubernatorial approval for parole of those serving a life sentence at Patuxent, has clearly operated to Mr. Sutton's disadvantage.

In arguing that the requirement of gubernatorial approval may validly be applied to Mr. Sutton, Dr. Gluckstern primarily relies upon the Supreme Court's decision in *Dobbert v. Florida,* 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977). That case involved a statutory change in trial procedure, an area where retroactive changes have often been upheld as not affecting " 'matters of substance.' " *Dobbert v. Florida, supra,* 432 U.S. at 293, 97 S.Ct. at

2298.[24] The challenged statute in *Dobbert* changed the role of the judge and the jury in sentencing proceedings under the Florida capital punishment statute. Under the former law, in a capital case, the death sentence was automatic absent a jury recommendation of mercy. Under the new law, retroactively applied to the defendant Dobbert, the jury's recommendation was merely advisory. The new statute provided that the jury's recommendation, whether for or against the death sentence, was not binding on the trial judge, and the decision to impose the death sentence was solely that of the trial judge. In addition, the new law contained numerous requirements, not found in the old law, restricting the trial judge in deciding to impose the death penalty.

Turning to the case at bar, Dr. Gluckstern argues that the change in the Maryland law, requiring gubernatorial approval for Mr. Sutton's parole, "is remarkably similar to the change in *Dobbert*—under the old statute, the jury's decision was final and under the new statute, the jury made a recommendation to the judge and he made the final decision." (Gluckstern's brief, p. 21). Apart from the fact that *Dobbert* involved a change in trial procedure whereas the present case involves a change in parole requirements, there is another major difference between *Dobbert* and the present case. In *Dobbert*, under the new Florida statute, the trial judge was substituted for the jury as the sole

---

**24.** As we recently pointed out in *Anderson v. Dep't of Health & Mental Hyg.,* 310 Md. 217, 225–226, 528 A.2d 904 (1987), *cert. denied,* 485 U.S. 913, 108 S.Ct. 1088, 99 L.Ed.2d 247 (1988), however,

"a change in the law which is deemed 'procedural' is not necessarily exempt from the ex post facto prohibition if the change affects substantial rights. *Kring v. Missouri, supra,* 107 U.S. at 232, 2 S.Ct. at 452 ('it is obvious that a law which is one of procedure may be obnoxious as an *ex post facto* law'). *See, e.g., Weaver v. Graham, supra,* 450 U.S. at 29 n. 12, 101 S.Ct. at 964 n. 12; *Thompson v. Utah,* 170 U.S. 343, 354–355, 18 S.Ct. 620, 624, 42 L.Ed. 1061 (1898). A change in the law which imposes the burden of proof upon the individual has been held to be within the ex post facto prohibition. *See, e.g., Cummings v. The State of Missouri, supra* [71 U.S. 277] 4 Wall. [277] at 328 [18 L.Ed. 356 (1866) ]; *United States v. Williams,* 475 F.2d 355 (D.C.Cir.1973)."

decision maker. In this case, the requirement of gubernatorial approval for parole is an additional requirement. Now, both the Institutional Board of Review and the Governor must decide in favor of parole. The 1982 statutory change did not make the role of the Board simply advisory or substitute the Governor for the Board. Unlike the situation in *Dobbert*, the effect of the Maryland statutory change was clearly to make the obtaining of parole more difficult.

Finally, Dr. Gluckstern's reliance on *Dobbert* entirely overlooks the one aspect of the *Dobbert* case which is somewhat similar to the case at bar. One of the contentions in *Dobbert* did relate to a provision of the new Florida statute making the obtaining of parole more difficult. The Supreme Court pointed out, however, that this provision was not being applied retroactively because of constitutional considerations. The Court explained (432 U.S. at 298, 97 S.Ct. at 2301):

> "Petitioner's third *ex post facto* contention is based on the fact that the new Florida statute provides that anyone sentenced to life imprisonment must serve at least 25 years before becoming eligible for parole. The prior statute contained no such limitation. The Florida Supreme Court in *Lee v. State*, 294 So.2d 305 (1974), found that this provision restricting parole could not constitutionally be applied to crimes committed prior to its effective date. Petitioner contends that nonetheless its enactment by the Florida Legislature amounts to an *ex post facto* law, and that because of this he may successfully challenge the death sentence imposed upon him.
>
> "Petitioner, of course, did not receive a life sentence, and so any added onus attaching to it as a result of the change in Florida law had no effect on him."

Dr. Gluckstern also relies on several cases holding that the ex post facto prohibition was inapplicable to changes by the United States Parole Commission in the Commission's own discretionary guidelines for granting parole. *See Dufresne v. Baer*, 744 F.2d 1543, 1547–1550 (11th Cir.1984), *cert. denied*, 474 U.S. 817, 106 S.Ct. 61, 88 L.Ed.2d 49

(1985); *Hayward v. United States Parole Com'n,* 659 F.2d 857 (8th Cir.1981), *cert. denied,* 456 U.S. 935, 102 S.Ct. 1991, 72 L.Ed.2d 454 (1982); *Warren v. United States Parole Commission,* 659 F.2d 183, 193 (D.C.Cir.1981), *cert. denied,* 455 U.S. 950, 102 S.Ct. 1454, 71 L.Ed.2d 665 (1982); *Rifai v. United States Parole Commission,* 586 F.2d 695, 698 (9th Cir.1978). *See also Portley v. Grossman,* 444 U.S. 1311, 100 S.Ct. 714, 62 L.Ed.2d 723 (1980) (opinion of Circuit Justice Rehnquist denying a stay). As these cases point out, however, the federal parole guidelines "do not have the force and effect of law" but are merely "polic[ies] ... that show how agency discretion is likely to be exercised," *Dufresne v. Baer, supra,* 744 F.2d at 1550. At the time of their offenses, the prisoners were "on notice" that amendments in the federal parole guidelines "might well occur," *id.* at 1548. The guidelines "may not in fact augment [a prisoner's] punishment, either actually or potentially" because "the Parole Commission may choose not to follow the guidelines in [the prisoner's] case," as "[w]hether to follow the guidelines ... is ... at the Commission's discretion." *Warren v. United States Parole Commission, supra,* 659 F.2d at 193 (emphasis in original deleted). Obviously these cases do not support Dr. Gluckstern's position. The requirement of gubernatorial approval for obtaining a parole does have the force of law, and is not a discretionary internal policy of the Institutional Board of Review. The requirement is mandatory and clearly makes it more difficult for one in Mr. Sutton's position to obtain parole.

In the present case, Judge DeWaters correctly held that the requirement of gubernatorial approval could not be applied to Mr. Sutton.

JUDGMENT OF THE COURT OF SPECIAL APPEALS VACATED, AND CASE REMANDED TO THAT COURT WITH DIRECTIONS TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY. PETITIONER TO PAY COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS.

McAULIFFE, Judge, dissenting.

I join in Parts I through IV of the Court's opinion. I do not agree with Part V, or with the result, and I therefore dissent.

Chapter 588 of the Acts of 1982, requiring gubernatorial approval for parole of a Patuxent inmate serving a life sentence did not "make[ ] more burdensome the punishment for a crime, after its commission." *Beazell v. Ohio*, 269 U.S. 167, 169–170, 46 S.Ct. 68, 68–69, 70 L.Ed. 216 (1925). Rather, Ch. 588 had the effect of returning Sutton to the same position he was in at the time he committed the murders in 1974. At that time, and at the time of Sutton's sentencing in 1975, a person sentenced to life imprisonment for murder could not be paroled without gubernatorial approval. Code (1957, 1978 Repl.Vol.), Art. 41, § 122(b).

Sutton did not gain a potential right to parole without gubernatorial approval until later in 1975 when, as a result of an entirely separate proceeding, he was adjudged a defective delinquent and was transferred to Patuxent Institution. Although the sentencing judge initiated the proceeding by ordering that Sutton be referred to Patuxent for evaluation, and he did so immediately after imposing sentence, the referral formed no part of the sentence. The referral was entirely discretionary. Code, (1957, 1976 Repl. Vol.) Art. 31B, § 6. The referral could have been made then, or at a later time, or not at all. Even after referral, Sutton might or might not have been determined to be a defective delinquent.

The possibility of a determination of defective delinquency status and transfer to Patuxent was not a part of the basic framework of imprisonment, parole, and good-time credits that existed at the time Sutton committed his crimes. It existed as a bare possibility that might occur at some time during a defendant's imprisonment. Whether the change of status actually occurred depended in part on whether any of the persons designated by the statute requested an evaluation, the discretion of the trial judge,

and whether the defendant would be found by a different court or jury to fit the definition of a defective delinquent.

> Originally, the Constitutional prohibition against the passage of *ex post facto* laws condemned any statute that
> > "punishes as a crime an act previously committed, which was innocent when done; which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with crime of any defense available according to law at the time when the act was committed....."

*Beazell v. Ohio, supra,* 269 U.S. at 169, 46 S.Ct. at 68. Because parole and good-time credits have become an integral part of the ordinary scheme of punishment by imprisonment, *ex post facto* protections have been extended to those areas. That extension, although a long stretch, has generally been viewed as being consistent with the basic concept of fairness that underlies the *ex post facto* clauses. This Court's further stretch of these principles to embrace a benefit associated with a bare possibility, unconnected with the traditional framework of sentencing and parole, is unwarranted.